GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
DOUGLAS A. AXEL (Cal. Bar #173814)
Deputy Chief, Major Frauds Section
RICHARD E. ROBINSON (Cal. Bar #090840)
ROBERT J. MCGAHAN (Cal. Bar #196568)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0689
    Facsimile:  (213) 894-6269
    E-mail: Richard.Robinson@usdoj.gov
        Doug.Axel@usdoj.gov
        Robert.McGahan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 06-776(A)-___ |
| Plaintiff, | ) | |
| | ) | PLEA AGREEMENT FOR DEFENDANT |
| v. | ) | STEVEN G. COOPERMAN |
| STEVEN G. COOPERMAN, | ) | |
| Defendant. | ) | |

    1.   This constitutes the plea agreement between STEVEN G. COOPERMAN ("defendant"), on the one hand, and the United States Attorney's Office for the Central District of California, on the other hand (the "USAO").  This agreement is limited to the USAO and cannot bind any other federal, state, or local prosecuting, administrative or regulatory authorities.

/ / /

/ / /

1

PLEA

2      2.   Defendant gives up the right to indictment by a grand

3   jury and agrees to plead guilty to a one-count information in the

4   form attached to this agreement or a substantially similar form.

5                    NATURE OF THE OFFENSE

6      3.   In order for defendant to be guilty of count one of the

7   information, which charges a violation of Title 18, United States

8   Code, Section 371, the following must be true:

9          (a)  Beginning in or before 1988, and continuing

10  through at least in or about 1999, there was an agreement between

11  two or more persons to commit at least one of the crimes charged

12  in the information, namely:

13               (i) to obstruct justice by corruptly influencing,

14  obstructing, and impeding, and endeavoring to influence,

15  obstruct, and impede, the due administration of justice in

16  lawsuits filed and litigated in courts of the United States, in

17  violation of Title 18, United States Code, Section 1503; and

18               (ii) to make false material declarations under

19  oath in proceedings before and ancillary to courts of the United

20  States, in violation of Title 18, United States Code,

21  Section 1623(a);

22          (b)  defendant became a member of the conspiracy, that

23  is, joined in the illegal agreement, knowing of at least one of

24  its objects and intending to help accomplish it; and

25          (c)  one of the members of the conspiracy performed at

26  least one overt act for the purpose of carrying out the

27  conspiracy.

28  / / /

4.    Defendant admits that defendant is, in fact, guilty of this offense, as described in count one of the information.

### PENALTIES

5.    The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is five-years imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6.    Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

7.    Defendant also understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury.

8.    Defendant further understands that the conviction in this case may subject defendant to various collateral consequences.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's plea of guilty.

/ / /

3

## WAIVER OF CONSTITUTIONAL AND OTHER RIGHTS

9.   By pleading guilty, defendant gives up the following rights:

(a)   The right to persist in a plea of not guilty.

(b)   The right to a speedy and public trial by jury.

(c)   The right to the assistance of legal counsel at trial, including the right to have the Court appoint counsel for defendant for the purpose of representation at trial.  (In this regard, defendant understands that, despite his plea of guilty, he retains the right to be represented by counsel – and, if necessary, to have the Court appoint counsel if defendant cannot afford counsel – at every other stage of the proceedings.)

(d)   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

(e)   The right to confront and cross-examine witnesses against defendant.

(f)   The right, if defendant wished, to testify on defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

(g)   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

10.   Defendant acknowledges that he breached the Case Disposition Agreement entered into between the parties effective August 22, 2000 in the case United States v. Cooperman, CR 98-1184(A)-ER (the "Case Disposition Agreement"), by committing

4

1   additional crimes during the time he was in prison between
2   October 2001 and July 2003.  Defendant further acknowledges that,
3   pursuant to paragraph 26 of the Case Disposition Agreement, he
4   has waived any and all statute of limitations defenses to the
5   charges in the indictment in this case and in the information to
6   which defendant is pleading guilty, because such charges were not
7   time-barred as of August 22, 2000.

8      11.  By pleading guilty, defendant gives up any and all
9   rights to pursue any affirmative defenses, Fourth Amendment or
10  Fifth Amendment claims, and other pretrial motions that could be
11  filed on his behalf, including assertion of any defense based on
12  statute of limitations or venue.

13                        SENTENCING FACTORS

14     12.  Defendant understands that the Court is required to
15  consider the United States Sentencing Guidelines ("U.S.S.G." or
16  "Sentencing Guidelines") among other factors in determining
17  defendant's sentence.  Defendant understands that the Sentencing
18  Guidelines are only advisory, and that after considering the
19  Sentencing Guidelines, the Court may be free to exercise its
20  discretion to impose any reasonable sentence up to the maximum
21  set by statute for the crime of conviction.

22     13.  Defendant and the USAO agree that the Court should
23  consider the 1998 Guidelines Manual because this version was in
24  effect at the time defendant committed the offense charged in the
25  information.  Defendant agrees that consideration of the 1998
26  Guidelines Manual does not violate the ex post facto clause, and
27  defendant waives any claim that any other Guidelines Manual
28  version should be considered instead of, or in addition to, the

1998 Guidelines Manual.

14.  Defendant and the USAO agree and stipulate to the following applicable sentencing guideline factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | [U.S.S.G. § 2J1.3(a)] |
| Specific Offense Characteristics | | |
| Substantial interference with admin. of justice: | 3 | [U.S.S.G. § 2J.13(b)(2)] |
| Abuse of position of trust: | 2 | [U.S.S.G. § 3B1.3] |
| Acceptance of responsibility: | <u>-3</u> | [U.S.S.G. § 3E1.1] |

Total Offense Level          14

The USAO will agree to a downward adjustment for acceptance of responsibility only if the conditions set forth in paragraph 17 are met.  Defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments or departures from the applicable Offense Level be imposed.  If, however, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section.

15.  There is no agreement as to defendant's criminal history or criminal history category.

16.  The stipulations in this agreement do not bind either the United States Probation Office or the Court.  Both defendant

6

and the USAO are free to:

(a)   Supplement the facts by supplying relevant information to the United States Probation Office and the Court;

(b)   Correct any and all factual misstatements relating to the calculation of the sentence; and

(c)   Argue on appeal and collateral review that the Court's sentencing guidelines calculations are not error, although each party agrees to maintain its view that the calculations in paragraph 14 are consistent with the facts of this case.

## DEFENDANT'S OBLIGATIONS

17.   Defendant agrees that he will:

(a)   Plead guilty as set forth in this agreement.

(b)   Not knowingly and willfully fail to abide by all sentencing stipulations contained in this agreement.

(c)   Not knowingly and willfully fail to: (i) appear as ordered for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

(d)   Not commit any crime; however, offenses which would be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are not within the scope of this agreement.

(e)   Not knowingly and willfully fail to be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

(f)   Pay the applicable special assessment at or before the time of sentencing.

/ / /

## THE USAO'S OBLIGATIONS

18.   If defendant complies fully with all defendant's obligations under this agreement, the USAO agrees:

(a)   To abide by all sentencing stipulations contained in this agreement.

(b)   At the time of sentencing to move to dismiss the underlying indictment against defendant.

(c)   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, to recommend a three-level reduction in the applicable sentencing guideline offense level, pursuant to U.S.S.G. § 3E1.1.

(d)   To recommend that defendant be sentenced to a term of imprisonment no greater than the low-end of the applicable sentencing guidelines range.

(e)   Not to further prosecute defendant for violations of federal law within the scope of defendant's conduct described in (i) the underlying indictment in this case, (ii) the information to which defendant is pleading guilty, or (iii) Exhibit A to the Case Disposition Agreement.  Defendant understands and agrees that the USAO is free to prosecute defendant for any other unlawful past conduct not specifically exempted by this agreement or any illegal conduct that occurs after the date of this agreement.  Defendant understands that at the time of sentencing the Court may consider conduct not charged in the information to which defendant is pleading guilty when determining defendant's sentence under the Sentencing Guidelines and 18 U.S.C. § 3553.

## BREACH OF AGREEMENT

19.   If defendant, at any time between the execution of this agreement and defendant's sentencing on a non-custodial sentence or surrender for service of a custodial sentence, whichever is later, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  If the USAO declares the agreement breached, and the Court finds such a breach to have occurred, defendant will not be able to withdraw defendant's guilty plea, and the USAO will be relieved of all its obligations under this agreement.  In particular:

(a)   The USAO will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crimes to which defendant has pleaded guilty.

(b)   The USAO will no longer be bound by any agreements regarding criminal prosecution, and will be free to prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated not to prosecute pursuant to this agreement.

(c)   The USAO will be free to prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

20.   Following a knowing and willful breach of this agreement by defendant, should the USAO elect to pursue any charge that was not filed as a result of this agreement, then:

(a)   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of

1  this agreement and the commencement of any such prosecution or
2  action.

3          (b)   Defendant gives up all defenses based on the
4  statute of limitations, any claim of preindictment delay, or any
5  speedy trial claim with respect to any such prosecution, except
6  to the extent that such defenses existed as of the date of
7  defendant's signing of this agreement.

8          LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK
9          21.   Defendant gives up the right to appeal any sentence
10 imposed by the Court and the manner in which the sentence is
11 determined, provided that (a) the sentence is within the
12 statutory maximum specified above and is constitutional, (b) the
13 Court in determining the applicable guideline range does not
14 depart upward in offense level or criminal history category and
15 determines that the total offense level is 14 or below, and
16 (c) the Court imposes a sentence within or below the range
17 corresponding to the determined total offense level and criminal
18 history category.  Defendant also gives up any right to bring a
19 post-conviction collateral attack on the conviction or sentence,
20 except a post-conviction collateral attack based on a claim of
21 ineffective assistance of counsel, a claim of newly discovered
22 evidence, or an explicitly retroactive change in the applicable
23 Sentencing Guidelines, sentencing statutes, or statutes of
24 conviction.  Notwithstanding the foregoing, defendant retains the
25 ability to appeal the conditions of supervised release imposed by
26 the Court, with the exception of the following: standard
27 conditions set forth in district court General Orders 318 and 01-
28 05; and the drug testing conditions mandated by 18 U.S.C. §§

1 | 3563(a)(5) and 3583(b)(7).

2 |     22.  The USAO gives up its right to appeal the Court's
3 | Sentencing Guidelines calculations, provided that (a) the Court
4 | in determining the applicable guideline range does not depart
5 | downward in offense level or criminal history category, (b) the
6 | Court determines that the total offense level is 14 or above, and
7 | (c) the Court imposes a sentence within or above the range
8 | corresponding to the determined offense level and criminal
9 | history category.

10 | COURT NOT A PARTY

11 |     23.  The Court is not a party to this agreement and need not
12 | accept any of the USAO's sentencing recommendations or the
13 | parties' stipulations.  Even if the Court ignores any sentencing
14 | recommendation, finds facts or reaches conclusions different from
15 | any stipulation, and/or imposes any sentence up to the maximum
16 | established by statute, defendant cannot, for that reason,
17 | withdraw defendant's guilty plea, and defendant will remain bound
18 | to fulfill all defendant's obligations under this agreement.  No
19 | one -- not the prosecutor, defendant's attorney, or the Court --
20 | can make a binding prediction or promise regarding the sentence
21 | defendant will receive, except that it will be within the
22 | statutory maximum.

23 |     24.  This agreement applies only to crimes committed by
24 | defendant and has no effect on any proceedings against defendant
25 | not expressly mentioned herein.

26 | NO ADDITIONAL AGREEMENTS

27 |     25.  Except for the Case Disposition Agreement, there are no
28 | promises, understandings or agreements between the USAO and

11

1  defendant or defendant's counsel.  Nor may any additional

2  agreement, understanding or condition be entered into unless in a

3  writing signed by all parties or on the record in court.

4          PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

5      26.  The parties agree and stipulate that this agreement

6  will be considered part of the record of defendant's guilty plea

7  hearing as if this entire agreement had been read into the record

8  of such proceedings.

9      27.  This agreement is effective upon signature by

10  defendant, defendant's attorney, and an Assistant United States

11  Attorney.

12  AGREED AND ACCEPTED

13  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF CALIFORNIA
14
   GEORGE S. CARDONA
15  Acting United States Attorney

16  THOMAS P. O'BRIEN
   Assistant United States Attorney
17  Chief, Criminal Division

18

19                                          Jan. 30, 2007
   DOUGLAS A. AXEL                              Date
20  RICHARD E. ROBINSON
   ROBERT J. MCGAHAN
21  Assistant United States Attorneys
   Major Frauds Section
22

23      I have read this agreement and carefully discussed every

24  part of it with my attorney.  I understand the terms of this

25  agreement, and I voluntarily agree to those terms.  My attorney

26  has advised me of my rights, of possible defenses, of the

27  Sentencing Guideline provisions, and of the consequences of

28  entering into this agreement.  No promises or inducements have

                                12

Jan 30 2007 7:54PM   Litman, Asche & Gioiella   914-238-0336   P.2
Case 2:06-cr-00776-JFW   Document 22   Filed 01/31/07   Page 13 of 64   Page ID #:68

JAN-29-2007 23:38   FROM:                                TO:19142380336        P.3/3

1   been made to me other than those contained in this agreement.   No
2   one has threatened or forced me in any way to enter into this
3   agreement.   Finally, I am satisfied with the representation of my
4   attorney in this matter.
5
6   _____                    _Jun 30-2007_
7   STEVEN G. COOPERMAN                                   Date
    Defendant
8
9       I am STEVEN G. COOPERMAN's attorney.   I have carefully
10   discussed every part of this agreement with my client.   Further,
11   I have fully advised my client of his rights, of possible
12   defenses, of the Sentencing Guideline provisions, and of the
13   consequences of entering into this agreement.   To my knowledge,
14   my client's decision to enter into this agreement is an informed
15   and voluntary one.
16
17   _____                    _1/30/07_
    RUSSELL GIOIELLA, ESQ.                               Date
18
    Counsel for Defendant
19   STEVEN G. COOPERMAN
20
21
22
23
24
25
26
27
28

13

**EXHIBIT A**

1

2

3

4

5

6

7                       UNITED STATES DISTRICT COURT

8                  FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10   UNITED STATES OF AMERICA,        )    CR 06- ____
                                      )
11                    Plaintiff,      )    **F I R S T**
                                      )
12            v.                      )    **S U P E R S E D I N G**
                                      )
13   STEVEN G. COOPERMAN,             )    **I N F O R M A T I O N**
                                      )
14                    Defendant.      )    [18 U.S.C. § 371: Conspiracy]
                                      )
15                                    )
                                      )
16                                    )
                                      )
17                                    )
                                      )
18   _____)

19

20

21

22

23

24

25

26

27

28
     DAA:RER:RJM

The United States Attorney charges:

## INTRODUCTORY ALLEGATIONS

I.   <u>DEFENDANT COOPERMAN AND OTHER RELEVANT PARTIES</u>

1.    Defendant STEVEN G. COOPERMAN ("COOPERMAN") is a former ophthalmologist whose primary residence was in Brentwood, California and, beginning in 1993, Fairfield, Connecticut. During the time relevant to this Indictment, COOPERMAN was an active purchaser and seller of publicly-traded stocks.

2.    At all times relevant to this Indictment, the law firm Milberg Weiss Bershad & Schulman LLP, formerly known as "Milberg Weiss Bershad Hynes & Lerach LLP" and "Milberg Weiss Bershad Specthrie & Lerach" ("Milberg Weiss"), was a New York law firm partnership with principal offices in New York, New York, and San Diego, California.  At all times relevant to this Indictment, Milberg Weiss represented plaintiffs in class actions and shareholder derivative actions in federal and state courts throughout the United States, including in the Central District of California.

3.    At all times relevant to this Indictment, Richard R. Purtich ("Purtich") was an attorney with an office in the Century City area of Los Angeles, California, whose law practice emphasized business, real estate, and insurance litigation. Purtich did not practice in the areas of plaintiffs' class action litigation or shareholder derivative litigation involving publicly traded companies.  During the times relevant to this Indictment, Purtich and the law firms with which he was associated represented defendant COOPERMAN in a variety of matters, including civil litigation concerning COOPERMAN's claims

1

1  to income disability insurance benefit payments from Paul Revere
2  Insurance Co. (the "Paul Revere matter"), COOPERMAN's sale of his
3  medical practice (the "Medical Practice Sale matter"), and
4  COOPERMAN's insurance loss claim based on the alleged theft of
5  artwork from COOPERMAN's home in 1992 and related matters (the
6  "Art Claim matter").

7      4.   At all times relevant to this Indictment, James P.
8  Tierney ("Tierney") was an attorney with offices in Santa Monica,
9  California.   Tierney did not practice in the areas of plaintiffs'
10  class action litigation or shareholder derivative litigation
11  involving publicly traded companies.   In or about 1992, defendant
12  COOPERMAN and Tierney staged a phony theft of two paintings --
13  Monet's "Officer's Cabin at Pourville" and Picasso's "Nude Before
14  a Mirror" (also known as "Reclining Nude") -- from COOPERMAN's
15  home in Brentwood, California.   Defendant COOPERMAN and Tierney
16  staged the "theft" of COOPERMAN's paintings (unbeknownst to
17  Purtich) so that COOPERMAN could fraudulently obtain compensation
18  for the allegedly stolen paintings from the insurers in the
19  Art Claim matter.

20      5.   At all times relevant to this Indictment, "Partner A,"
21  "Partner B," and David J. Bershad ("Bershad") were senior
22  partners in Milberg Weiss.   Steven G. Schulman ("Schulman")
23  became a non-equity partner in Milberg Weiss on or about
24  January 1, 1989, and became an equity partner in Milberg Weiss on
25  or about January 1, 1991.

26      6.   During the time relevant to this Indictment, "Cooperman
27  Plaintiff 1" and "Cooperman Plaintiff 2" were doctors who were
28  friends of defendant COOPERMAN.

7.   During the time relevant to this Indictment, "Cooperman Brother-in-Law A" and "Cooperman Brother-in-Law B" were two brothers-in-law of defendant COOPERMAN.

## II.   CLASS ACTIONS AND SHAREHOLDER DERIVATIVE ACTIONS

### A.   Overview

8.   The term "class action" refers to a certain type of civil lawsuit in which a court authorizes a named plaintiff to represent and litigate claims on behalf of unnamed class members who are not actually before the court (referred to as "absent class members").

9.   Class actions often are brought to address allegations of fraud; breaches of certain legal duties of fidelity, trust, and loyalty (known as "fiduciary duties"); and other financial wrongdoing affecting publicly traded companies.  In some such cases, referred to as "securities fraud class actions," a named plaintiff alleges that his or her investment in such a company was harmed by wrongdoing committed by company executives and others, and seeks to obtain money and other relief on behalf of a class of investors in that company who are alleged to have been similarly harmed.

10.  Class actions also often are brought to address allegations that a consumer product or service was defective, deceptively represented, or illegally priced.  In such cases (referred to as "consumer class actions"), a named plaintiff alleges that he or she was injured or defrauded by the manufacturers or sellers of the product or service, and seeks to obtain money and other relief on behalf of a class of consumers who are alleged to have been similarly harmed.

3

11.   A judgment in a class action (whether the result of a trial or a settlement) typically binds absent class members who do not expressly notify the court that they wish to "opt out" of the litigation.

12.   The term "shareholder derivative action" refers to a certain type of civil lawsuit in which a named plaintiff, who is a shareholder in a corporation, is authorized by a court to represent the interests of other shareholders of the corporation, as well as the corporation itself, in seeking the adjudication of rights and obligations of the corporation.  As in a class action, a judgment in a shareholder derivative action typically binds unnamed shareholders who are not before the court.

13.   When a controlling shareholder in a corporation attempts to acquire the publicly held shares in that corporation, a certain type of class action and/or shareholder derivative action, referred to as a "transaction case," may be brought.  In such a case, a named plaintiff, who owns a minority of the shares in the corporation, alleges on behalf of a class of shareholders that the price per share offered by the controlling shareholder to acquire the remaining shares is too low, and does not represent the fair value of the publicly held shares.

14.   Class actions and shareholder derivative actions are begun by the filing of a complaint in federal or state court, in which a named plaintiff alleges, among other things, the nature of the claims against the defendants in the action, the reasons why the action should be maintained as a class action or shareholder derivative action, and the reasons why the court should authorize the named plaintiff and his or her attorneys to

4

represent the interests of absent class members or shareholders in the action.

15.   Before a judgment in a class action or shareholder derivative action may bind absent class members or shareholders, a named plaintiff and the attorneys who seek to represent absent class members or shareholders have to demonstrate to the court's satisfaction, among other things, that: (a) the named plaintiff's claims are "typical" of the claims of the absent class members or shareholders; (b) the named plaintiff has no interest in the outcome of the action that is antagonistic to, or in conflict with, the interests of the absent class members or shareholders; (c) the named plaintiff is not subject to unique defenses that could become the focus of the litigation to the detriment of the absent class members or shareholders; and (d) the named plaintiff's attorneys will be able to fairly and adequately represent the interests of the absent class members or shareholders.

16.   The court's determination that a lawsuit may proceed as a class action or shareholder derivative action is referred to as the "certification" of the action.

B.   **Benefits of Securing "Lead Counsel" Status**

17.   In many class actions and shareholder derivative actions, more than one named plaintiff and more than one lawyer or law firm seek to represent, and are approved by the court to represent, the interests of absent class members or shareholders. In such cases, the lawyers and law firms often compete to be appointed by the court as "lead counsel" or "co-lead counsel" for the absent class members or shareholders.   A lawyer or law firm

that is appointed as lead or co-lead counsel typically has power and responsibility, among other things, to: (a) coordinate the overall litigation strategy; (b) assign the work to be done on the case among lawyers and law firms who have been approved to represent the class members or shareholders; and (c) in some cases, determine the division of attorneys' fees awarded by the court among the lawyers and law firms who have worked on the case.

C.   **Fiduciary Duties of Named Plaintiffs and Their Attorneys**

18.   Because the conduct and decisions of a named plaintiff in a class action or shareholder derivative action affect the interests and rights of class members or shareholders who are not before the court, the named plaintiff owes these absent class members or shareholders certain fiduciary duties.  As a result of these legally imposed duties, a named plaintiff, among other things: (a) may not place his or her own interests above those of absent class members or shareholders; (b) may not act in a deceitful or unethical manner toward the court or the absent class members or shareholders; and (c) is required to disclose to the court any fact that reasonably could affect his or her ability to fairly or adequately represent the interests of the absent class members or shareholders.

19.   The named plaintiff's attorneys in a class action or shareholder derivative action also owe the absent class members or shareholders fiduciary duties.  As a result of these legally imposed duties, the named plaintiff's attorneys, among other things: (a) may not give preferential treatment to the interests

6

of the named plaintiff over the interests of the absent class members or shareholders; (b) may not act in a deceitful or unethical manner toward the court or the absent class members or shareholders; and (c) are required to disclose to the court any fact that reasonably could affect the attorneys' ability to fairly or adequately represent the interests of the absent class members or shareholders.

### D.    Court Approval of Settlements and Awards of Attorneys' Fees

20.    Courts presiding over class actions or shareholder derivative actions are obligated to protect the rights and interests of the absent class members or shareholders.  As a result, a court is required to scrutinize any proposed settlement of a class action or shareholder derivative action, and may approve such a settlement only if the court first determines that the settlement is fair to absent class members or shareholders.

21.    The named plaintiff's attorneys in class actions often seek to obtain their attorneys' fees from the recovery obtained for the class in the lawsuit; in shareholder derivative actions they often seek to obtain their attorneys' fees from the corporation.  The attorneys' fees in such instances are paid, directly or indirectly, from proceeds that otherwise would be available to the absent class members or shareholders.  Courts presiding over class actions or shareholder derivative actions are obligated, on behalf of the absent class members or shareholders, to scrutinize any request for attorneys' fees to ensure its fairness and reasonableness.  Consistent with their fiduciary duties, the named plaintiff's attorneys are required,

7

as part of any request for attorneys' fees, to disclose to the court all facts that reasonably could bear on their entitlement to the requested fees.

### E.   Limitations on Compensation of Named Plaintiffs

22.   The compensation that may be paid to a named plaintiff in a class action or shareholder derivative action is limited to the following: (a) the named plaintiff's pro rata share of the recovery obtained in the lawsuit, calculated on the same basis as the pro rata shares available to all of the absent class members or shareholders; and (b) his or her reasonable costs and expenses incurred in connection with the lawsuit, as approved by the court. Additionally, in some circumstances, the court presiding over such a lawsuit may award a modest bonus payment to the named plaintiff, in recognition of his or her effort in obtaining a beneficial result for the absent class members or shareholders. Such a bonus payment may be awarded only if it is first disclosed to absent class members or shareholders, and only after the absent class members or shareholders have an opportunity to object to the bonus award.

23.   Because a named plaintiff acts as a fiduciary toward absent class members or shareholders and is required to remain free of any conflict of interest toward them, the named plaintiff may not have any financial interest in the outcome of a class action or shareholder derivative action lawsuit other than those described above.

8

III.  **MILBERG WEISS'S SECRET AND ILLEGAL KICKBACK ARRANGEMENT WITH DEFENDANT COOPERMAN**

24.  During the time relevant to this Indictment, Milberg Weiss brought numerous class actions and shareholder derivative actions against publicly traded companies and other major businesses.  These lawsuits generated substantial attorneys' fees for Milberg Weiss.  To bring these lawsuits, Milberg Weiss needed persons who would agree to serve as named plaintiffs, and whom the courts would likely approve to represent absent class members or shareholders.

25.  Among the persons serving as named plaintiffs for Milberg Weiss were defendant COOPERMAN and certain of his relatives and associates, including Cooperman Plaintiff 1 and Cooperman Plaintiff 2.  Between in or about 1988 and continuing until at least 1999, these individuals served as named plaintiffs in approximately seventy class actions and shareholder derivative actions brought by Milberg Weiss in federal and state courts throughout the United States, including in the Central District of California.  The class actions and shareholder derivative actions in which COOPERMAN, his spouse, Cooperman Plaintiff 1, and Cooperman Plaintiff 2 (collectively the "COOPERMAN Plaintiffs") served as named plaintiffs for Milberg Weiss are referred to herein as the "Lawsuits."

26.  Beginning at least as early as in or about 1988 and continuing through at least 1997, in order to facilitate the recruitment of defendant COOPERMAN and his relatives and associates to serve as named plaintiffs, Milberg Weiss, Partner A, Partner B, Bershad, and others agreed to and secretly

1    did pay, as illegal kickbacks to COOPERMAN, a substantial portion
2    of the attorneys' fees Milberg Weiss obtained in the lawsuits in
3    which COOPERMAN or one of his associates or relatives served as a
4    named plaintiff, as well as other lawsuits in which COOPERMAN
5    provided information for use by Milberg Weiss.  Kickbacks
6    COOPERMAN received in connection with Lawsuits in which Cooperman
7    Plaintiff 1 or Cooperman Plaintiff 2 served as a named plaintiff
8    were shared with Cooperman Plaintiff 1 and Cooperman Plaintiff 2,
9    respectively.

10        27.   During the times relevant to this Indictment,
11   Milberg Weiss's kickback arrangement with and kickback payments
12   to defendant COOPERMAN were illegal and improper for the
13   following reasons, among others: (a) under applicable New York
14   law, it is a criminal offense for an attorney to promise or give
15   anything of value to induce a person to bring a lawsuit, or to
16   reward a person for having done so; (b) under applicable New York
17   law, it is a criminal offense to pay a fiduciary, without the
18   consent of those to whom he or she owes fiduciary duties, with
19   the intent to influence his or her conduct as a fiduciary;
20   and (c) under applicable New York and California laws, lawyers
21   may not share attorneys' fees with persons who are not duly
22   licensed to practice law.  Additionally, the kickback
23   arrangements created a conflict of interest between the
24   COOPERMAN Plaintiffs and those to whom they owed fiduciary duties
25   because, as a result of the kickback arrangements,. the
26   COOPERMAN Plaintiffs had a greater interest in maximizing the
27   amount of attorneys' fees awarded to Milberg Weiss than in
28   maximizing the net recovery to the absent class members and

1  shareholders.

2      28.   To conceal their illegal kickback arrangement from the

3  courts presiding over the Lawsuits, the other parties to the

4  Lawsuits, and the absent class members and shareholders whose

5  interests they purported to represent in the Lawsuits, defendant

6  COOPERMAN, Milberg Weiss, Partner A, Partner B, Bershad,

7  Schulman, Cooperman Plaintiff 1, Cooperman Plaintiff 2, and

8  others engaged in various fraudulent and deceptive acts,

9  practices, and devices.   Among other things, COOPERMAN,

10 Milberg Weiss, Partner A, Partner B, Bershad, Schulman, Cooperman

11 Plaintiff 1, Cooperman Plaintiff 2, and others made and caused

12 others to make false and misleading statements, and omitted and

13 caused others to omit material facts, in complaints, motions,

14 certifications, declarations, and other documents filed in the

15 Lawsuits, and in depositions and other discovery of COOPERMAN,

16 Cooperman Plaintiff 1, and Cooperman Plaintiff 2 taken in the

17 Lawsuits.   Additionally, Milberg Weiss, Partner A, Partner B,

18 Bershad, Schulman, and others concealed and disguised the illegal

19 kickbacks by, among other things, paying the kickbacks in cash

20 and through Purtich, Tierney, and Cooperman Brother-in-Law B, who

21 then used and disbursed the payments at the direction of

22 defendant COOPERMAN, and for his benefit.

23     29.   The concealment of the secret and illegal kickback

24 arrangement and payments from the courts presiding over the

25 Lawsuits influenced, obstructed, and impeded the ability of such

26 courts to assess and determine: (a) the appropriateness of

27 approving the Lawsuits to proceed as class actions or shareholder

28 derivative actions; (b) the ability of the COOPERMAN Plaintiffs

1   to fairly and adequately represent the interests of the absent

2   class members or shareholders; (c) the ability of Milberg Weiss

3   and its lawyers to fairly and adequately represent the interests

4   of the absent class members or shareholders; (d) the fairness of

5   settlements proposed by Milberg Weiss and the COOPERMAN

6   Plaintiffs in the Lawsuits; and (e) whether and the extent to

7   which Milberg Weiss should be awarded the attorneys' fees it

8   sought in the Lawsuits.

9   **IV.   SUMMARY OF KICKBACK PAYMENTS TO DEFENDANT COOPERMAN**

10       30.   As a result of this illegal and fraudulent scheme,

11   between in or about 1989 and in or about 2003, Milberg Weiss

12   obtained more than $133 million in attorneys' fees in the

13   Lawsuits.   During this period, Milberg Weiss made approximately

14   $6.4 million in secret and illegal kickback payments for the

15   benefit of defendant COOPERMAN, Cooperman Plaintiff 1, and

16   Cooperman Plaintiff 2.

17       31.   Between in or about January 1989 and February 1991,

18   defendant COOPERMAN and Cooperman Plaintiff 1 received kickbacks

19   of at least $175,000 for serving as named plaintiffs in the

20   shareholder derivative action brought by Milberg Weiss referred

21   to as Newhall Land, which were paid to COOPERMAN through a

22   combination of a phony art option payment by Partner A to

23   COOPERMAN and phony "retainer" payments by Milberg Weiss that

24   Bershad provided to Cooperman Brother-in-Law B.

25       32.   Defendant COOPERMAN and Cooperman Plaintiff 1 also

26   received kickbacks valued at $86,000 in connection with five

27   additional Milberg Weiss cases that settled prior to 1991, which

28   were paid to COOPERMAN through a combination of a $16,000 cash

payment delivered by Partner B directly to COOPERMAN, a bogus

"consultation" fee that Partner B and Bershad caused Milberg

Weiss to pay to Tierney, and bogus "retainer" payments by Milberg

Weiss that Bershad provided to Cooperman Brother-in-Law B.

33. In addition, defendant COOPERMAN received kickback

payments from Milberg Weiss in the form of Milberg Weiss checks,

in the following amounts, signed by Bershad, issued to Tierney

and Purtich, which were associated by Bershad in accompanying

cover letters with the lawsuits identified below and procedurally

related lawsuits:

| Common Case Name, Case Number, and Court | Named Plaintiff(s) | Date of Kickback | Approximate Kickback |
|---|---|---|---|
| Cetus, No. C-90-2042 (United States District Court, Northern District of California) | Cooperman | 11/20/91 | $ 178,507 |
| Cineplex Odeon, No. CV 89-2579 (United States District Court, Central District of California) | Cooperman | 01/08/92 | $ 21,376 |
| Jan Bell Marketing, No. CV 90-6183 (United States District Court, Southern District of Florida) | Cooperman | 07/21/92 | $ 19,363 |
| American Continental/ Lincoln Savings, No. CV 89-2448 (United States District Court, Central District of California) | Cooperman Plaintiff 1 | 10/21/92 | $ 440,000 |
| | | 07/19/93 | $ 250,000 |
| | | 11/09/94 | $ 160,000 |
| | | 12/21/95 | $ 163,000 |
| Software Toolworks, No. C-90-2920 (United States District Court, Northern District of California) | Cooperman | 12/16/92 | $ 317,885 |
| | | 01/15/93 | $ 30,605 |

| Common Case Name, Case Number, and Court | Named Plaintiff(s) | Date of Kickback | Approximate Kickback |
|---|---|---|---|
| LA Gear, No. CV 90-2832 (United States District Court, Central District of California) | Cooperman | 01/29/93 | $  50,000 |
| | | 05/18/93 | $ 160,000 |
| | | 07/19/93 | $   7,476 |
| Prime Motor Inns, No. 90-99 (United States District Court, District of New Jersey) | Cooperman | 03/12/93 | $ 200,286 |
| Sun Microsystems, No. C-93-20292 (United States District Court, Northern District of California) | Cooperman | 08/16/93 | $  99,887 |
| One Bancorp, Civil No. 89-0315 (United States District Court, District of Maine) | Cooperman | 08/16/93 | $  39,332 |
| Epitope, Civ. No. 92-780 (United States District Court, District or Oregon) | Cooperman | 08/16/93 | $   3,849 |
| Fairfield Communities, No. C-90-464 (United States District Court, Eastern District of Arkansas) | Cooperman | 08/16/93 | $  24,996 |
| Shawmut, No. H-90-253 (United States District Court, District of Connecticut) | Cooperman | 08/16/93 | $  13,436 |
| Valley National, No. Civ. 89-1733 (United States District Court, District of Arizona) | Cooperman | 03/01/94 | $  17,458 |
| First Executive, No. 89-7135 (United States District Court, Central District of California) | Cooperman | 03/11/94 | $ 763,997 |
| | | 05/27/94 | $ 211,000 |
| | | 05/27/94 | $ 100,000 |
| | | 02/15/95 | $ 100,000 |
| | | 12/21/95 | $ 200,000 |
| | | 12/21/95 | $ 140,000 |
| | | 04/04/96 | $ 150,000 |

14

| Common Case Name, Case Number, and Court | Named Plaintiff(s) | Date of Kickback | Approximate Kickback |
|---|---|---|---|
| Columbia Savings & Loan, No. CV 89-6538 (United States District Court, Central District of California) | Cooperman | 03/31/94 | $ 200,000 |
| | | 04/29/94 | $ 112,495 |
| | | 07/27/94 | $ 200,000 |
| | | 08/04/94 | $ 250,000 |
| | | 09/22/94 | $ 191,278 |
| | | 03/30/95 | $ 79,000 |
| | | 03/30/95 | $ 79,000 |
| U.S. Bioscience, No. CV 92-0743 (United States District Court, Eastern District of Pennsylvania) | associate of Cooperman | 09/22/94 | $ 2,700 |
| Abbott Laboratories, Civ. No. 632601 (San Diego County, California, Superior Court) (aka "Infant Formula") | Cooperman | 07/07/95 | $ 25,868 |
| T2 Medical, No. CV 94-1584 (United States District Court, Northern District of Georgia) | one of Cooperman's brothers-in-law ("Cooperman Brother-in-Law A") | 07/07/95 | $ 6,433 |
| Fidelity Medical, No. 92-1913 (United States District Court, District of New Jersey) | Cooperman's wife | 07/07/95 | $ 22,207 |
| SCI-TV, No. BC100359 (Los Angeles County, California, Superior Court) | Cooperman | 11/01/95 | $ 100,000 |
| | | 11/16/95 | $ 81,846 |
| | | 11/16/95 | $ 100,000 |
| | | 12/01/95 | $ 40,000 |
| | | 12/01/95 | $ 40,000 |
| Community Psychiatric, No. 91-5258 (United States District Court, Central District of California) | Cooperman | 03/07/96 | $ 180,140 |

15

34.   Defendant COOPERMAN also received kickback payments from Milberg Weiss in the form of Milberg Weiss checks, signed by Bershad, issued to Tierney and Purtich with respect to the following lawsuits in which Milberg Weiss "recognized" COOPERMAN for supplying useful information:

a.   ADAC: $36,666.70 paid 5/12/92;

b.   Sunrise Technology: $12,800 paid 9/22/94;

c.   Optical Radiation: $19,017 paid 11/07/94; and

d.   Figgie: $55,635 paid 7/31/96

35.   In addition, between November 1996 and May 1997, at defendant COOPERMAN's direction, Milberg Weiss and Bershad sent to COOPERMAN four Milberg Weiss kickback checks totaling $281,871, issued payable to Tierney and Purtich, with respect to COOPERMAN's serving as named plaintiff in Community Psychiatric and Software Toolworks, and Cooperman Plaintiff 2's serving as named plaintiff in Heart Technology, which checks COOPERMAN then deposited into his own bank account.

COUNT ONE

[18 U.S.C. § 371]

[Conspiracy]

36.   The United States Attorney hereby repeats and realleges paragraphs 1 through 35 of this Indictment.

I.   **THE OBJECTS OF THE CONSPIRACY**

37.   Beginning in or about April 1988, and continuing until at least 1999, within the Central District of California and elsewhere, defendant COOPERMAN, Milberg Weiss, Partner A, Partner B, Bershad, Schulman, and other persons known and unknown to the United States Attorney, knowingly combined, conspired, and agreed to commit the following offenses against the United States:

a.   to commit obstruction of justice by corruptly influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due administration of justice in the Lawsuits filed and litigated in federal courts, in violation of Title 18, United States Code, Section 1503; and

b.   to make false material declarations under oath in proceedings before and ancillary to courts of the United States, in connection with the Lawsuits filed and litigated in federal courts, in violation of Title 18, United States Code, Section 1623(a).

II. **THE MANNER AND MEANS OF THE CONSPIRACY**

38.   The objects of the conspiracy were carried out, in part, in the manner and by the means described below.

39.   Milberg Weiss, Partner A, Partner B, Bershad, Schulman, and others arranged for defendant COOPERMAN to serve, and to

17

1    cause certain of his relatives and associates to serve, as named

2    plaintiffs in class actions and shareholder derivative actions in

3    which Milberg Weiss served as counsel.

4        40.   As an inducement to defendant COOPERMAN to serve, and

5    to induce COOPERMAN to cause his relatives and associates to

6    serve, as named plaintiffs, Milberg Weiss, Partner A, Partner B,

7    Bershad, and others offered, promised, and agreed secretly to pay

8    COOPERMAN kickbacks consisting of a portion of the attorneys'

9    fees that Milberg Weiss expected to obtain in each lawsuit in

10   which COOPERMAN served, or caused a relative or associate to

11   serve, as a named plaintiff, or for which COOPERMAN provided

12   useful information to Milberg Weiss.

13       41.   In the Lawsuits in which Cooperman Plaintiff 1 or

14   Cooperman Plaintiff 2 served as a named plaintiff, defendant

15   COOPERMAN agreed to and did share the kickbacks he received from

16   Milberg Weiss with Cooperman Plaintiff 1 or Cooperman

17   Plaintiff 2, respectively.

18       42.   In the course of the Lawsuits, defendant COOPERMAN,

19   Milberg Weiss, Partner A, Partner B, Bershad, Schulman, Cooperman

20   Plaintiff 1, Cooperman Plaintiff 2, and others engaged in, and

21   caused each other to engage in, various fraudulent and deceptive

22   acts, practices, and devices, including the following:

23           a.   COOPERMAN, Milberg Weiss, Partner A, Partner B,

24   Bershad, Schulman, Cooperman Plaintiff 1, Cooperman Plaintiff 2,

25   and others concealed their illegal kickback arrangements from the

26   courts presiding over, the other parties to, and the absent class

27   members and shareholders in the Lawsuits;

28   / / /

18

b.   COOPERMAN, Milberg Weiss, Partner A, Partner B, Bershad, Schulman, and others made and caused to be made false and misleading representations in: (i) complaints to initiate and maintain the Lawsuits; (ii) motions seeking court approval for the Lawsuits to proceed as class actions or shareholder derivative actions; and (iii) motions seeking court approval of Milberg Weiss and the COOPERMAN Plaintiffs to represent absent class members or shareholders in the Lawsuits.  Specifically, they caused to be represented in these pleadings that the COOPERMAN Plaintiffs had no interest in conflict with, or antagonistic to, absent class members or shareholders in the Lawsuits, and that Milberg Weiss and the COOPERMAN Plaintiffs would fairly and adequately represent their interests.  In truth and in fact, as defendant COOPERMAN, Milberg Weiss, Partner A, Partner B, Bershad, Schulman, Cooperman Plaintiff 1, and Cooperman Plaintiff 2 well knew, the interests of the COOPERMAN Plaintiffs conflicted with those of absent class members or shareholders because, as a result of their secret and illegal kickback arrangements, they had a greater interest in maximizing the amount of attorneys' fees awarded to Milberg Weiss than in maximizing the net recovery to the absent class members or shareholders.  Additionally, as a result of the secret and illegal kickback arrangements, Milberg Weiss improperly favored the financial interests of the COOPERMAN Plaintiffs over the interests of the absent class members or shareholders;

c.   In under-oath testimony given in connection with the Lawsuits and in written certifications, declarations, and other documents signed under penalty of perjury in the Lawsuits,

19

1  COOPERMAN, Cooperman Plaintiff 1, and Cooperman Plaintiff 2,
2  acting in concert with Milberg Weiss and others, falsely denied
3  that they had ever received, or expected to receive, any payment
4  for serving as a named plaintiff other than their pro rata share
5  of the recovery based on the same terms as the pro rata shares
6  available to all of the absent class members or shareholders.  In
7  truth and in fact, as they well knew, in return for serving as
8  named plaintiffs, COOPERMAN, Cooperman Plaintiff 1, and Cooperman
9  Plaintiff 2 had received and expected to receive from
10 Milberg Weiss kickback payments that substantially exceeded any
11 pro rata share of the recovery they received, or could expect to
12 receive, based on the terms used to determine the pro rata shares
13 available to all of the absent class members or shareholders in
14 the Lawsuits;

15       d.   COOPERMAN, Milberg Weiss, and others caused the
16 Lawsuits to be settled in a manner that often would generate
17 substantial attorneys' fees for Milberg Weiss, while concealing
18 from the courts approving these settlements, and from the absent
19 class members or shareholders on whose behalf the settlements
20 were being negotiated, their secret and illegal kickback
21 arrangement; and

22       e.   Milberg Weiss, COOPERMAN, Partner A, Partner B,
23 Bershad, Schulman, and others caused to be filed motions in the
24 Lawsuits seeking the awards of attorneys' fees to Milberg Weiss,
25 in which they concealed from the courts awarding attorneys' fees,
26 and the absent class members or shareholders, their illegal
27 kickback arrangements under which the awarded attorneys' fees
28 secretly would be shared with COOPERMAN, Cooperman Plaintiff 1,

20

1 and Cooperman Plaintiff 2.

2     43. In the course of certain of the securities fraud class

3 action Lawsuits, defendant COOPERMAN, Milberg Weiss, Partner A,

4 Partner B, Bershad, Schulman, Cooperman Plaintiff 1, Cooperman

5 Plaintiff 2, and others engaged in, and caused each other to

6 engage in, additional fraudulent and deceptive acts, practices,

7 and devices, including the following:

8       a. Milberg Weiss, Partner B, Bershad, Schulman, and

9 others falsely represented and caused to be falsely represented

10 in complaints and other pleadings filed in such Lawsuits that the

11 plaintiffs' claims were typical of the claims of the members of

12 the class and that the plaintiffs relied on the allegedly false

13 and misleading statements made by the defendants in the Lawsuits

14 when purchasing the securities at issue in the Lawsuits. In

15 truth and in fact, as Milberg Weiss, Partner B, Bershad, Schulman

16 and others well knew, the plaintiffs' claims in such Lawsuits

17 were not typical of the claims of the class members. Unlike the

18 other class members in the Lawsuits, COOPERMAN, COOPERMAN

19 Plaintiff 1, and COOPERMAN Plaintiff 2 purchased the securities

20 at issue anticipating that the securities would decline in value,

21 in order to position themselves to be named plaintiffs in

22 securities fraud class actions and to obtain kickback payments

23 from Milberg Weiss and others; and

24       b. In under-oath testimony given in connection with

25 such Lawsuits and in written certifications, declarations, and

26 other documents signed under penalty of perjury in such Lawsuits,

27 defendant COOPERMAN, Cooperman Plaintiff 1, and Cooperman

28 Plaintiff 2, acting in concert with Milberg Weiss, Partner A,

Partner B, Bershad, Schulman, and others, falsely denied that
they purchased the securities at issue in the Lawsuits in order
to be named plaintiffs.  In truth and in fact, as they well knew,
defendant COOPERMAN, Cooperman Plaintiff 1, and Cooperman
Plaintiff 2 purchased the securities at issue in order to
position themselves to be named plaintiffs in securities fraud
class actions and to obtain kickback payments from Milberg Weiss
and others.

44.  After the court in a Lawsuit awarded attorneys' fees,
or was expected to award attorneys' fees, defendant COOPERMAN,
Milberg Weiss, Partner A, Partner B, Bershad, and others arranged
for the secret and illegal kickbacks to be paid to COOPERMAN.  To
conceal and disguise these kickback payments, among other things:

a.  Milberg Weiss and Partner B made a kickback
payment in cash given directly to defendant COOPERMAN;

b.  Milberg Weiss, Partner A, and Partner B caused a
kickback payment to be paid by personal check from Partner A to
COOPERMAN, disguised as a phony "option payment" by Partner A on
COOPERMAN's painting by Picasso, entitled "Nude Before a Mirror"
and also known as "Reclining Nude"; and

c.  Milberg Weiss, Partner B, Bershad, and others made
and caused kickback payments to be made by Milberg Weiss checks
payable to Purtich,  Tierney, and Cooperman Brother-in-Law B, who
then used and disbursed the payments at the direction, and for
the benefit, of defendant COOPERMAN.

45.  To further conceal and disguise the kickbacks paid by
Milberg Weiss checks made payable to Tierney, Purtich, and
Cooperman Brother-in-Law B (each a "Cooperman Intermediary"):

1         a.   Milberg Weiss, Bershad, and others caused such
2    payments to be falsely characterized in Milberg Weiss's
3    accounting books and records as, among other things, referral
4    fees, professional fees, and "fees to others" paid to a Cooperman
5    Intermediary;

6         b.   Milberg Weiss, Partner B, Bershad, and others
7    falsely characterized Milberg Weiss payments to Tierney and
8    Purtich as, among other things: the intermediary lawyer's
9    "entitlement" in accordance with their "prior understandings" in
10   a Lawsuit; his payment for work and responsibility "assumed" in a
11   Lawsuit; his "share" of attorneys' fees in a Lawsuit; his
12   "participation" or "interest" in Milberg Weiss's fee award in a
13   Lawsuit; his "portion" of the fees awarded to all plaintiffs'
14   counsel in a Lawsuit; his compensation for "work and
15   responsibility" in a Lawsuit; his "agreed upon 5% share" of "our
16   joint fees" in a Lawsuit; his "participation" in Milberg Weiss's
17   fees as a result of his "referring and other contributions"
18   towards a Lawsuit; and payments of Milberg Weiss's obligations to
19   him with regard to "referring Steven Cooperman" with regard to a
20   Lawsuit;

21        c.   Milberg Weiss, Bershad, and others falsely
22   characterized payments to Cooperman Brother-in-Law B in
23   accompanying cover letters as his "retainers" with regard to
24   specified Milberg Weiss cases; and

25        d.   Milberg Weiss, Bershad, and others issued and
26   caused to be issued IRS Forms 1099-MISC to Tierney, Purtich and
27   Purtich's associated law firms, which made it appear as if such
28   payments were fees for their benefit rather than for the benefit

1 │ of COOPERMAN.

2 │     46.  After the Cooperman Intermediaries received kickback
3 │ payments from Milberg Weiss, defendant COOPERMAN directed the
4 │ Cooperman Intermediaries to use and apply such kickback payments
5 │ for the benefit of defendant COOPERMAN including, among other
6 │ things:

7 │     a.  to make payments directly to COOPERMAN or a
8 │ company owned and controlled by COOPERMAN;

9 │     b.  in the case of Purtich, to satisfy legal fees or
10 │ expenses that COOPERMAN owed or would owe to Purtich and his
11 │ associated law firms, including fees COOPERMAN owed in connection
12 │ with the Paul Revere matter, the Medical Practice Sale matter,
13 │ and the Art Claim matter; and

14 │     c.  in the case of Tierney, to compensate him for
15 │ staging the phony "theft" of COOPERMAN's paintings.

16 │ **III. OVERT ACTS**

17 │     47.  In furtherance of the conspiracy and to accomplish its
18 │ objects, defendant COOPERMAN, together with Milberg Weiss,
19 │ Partner A, Partner B, Bershad, Schulman, Cooperman Plaintiff 1,
20 │ Cooperman Plaintiff 2, and others known and unknown to the
21 │ United States Attorney, committed and caused others to commit the
22 │ following overt acts, among others, in the Central District of
23 │ California and elsewhere, in connection with the following
24 │ Lawsuits:

25 │ **A.**   **_Newhall Land_**

26 │     Overt Act No. 1: On or about April 19, 1988, defendant
27 │ COOPERMAN, Milberg Weiss, Partner B, and others caused to be
28 │ filed a verified derivative and class action complaint in Newhall

24

Land, naming COOPERMAN and Cooperman Plaintiff 1 as plaintiffs.

Overt Act No. 2: On or about November 15, 1988, defendant COOPERMAN signed under penalty of perjury a declaration in support of plaintiffs' application for approval of a settlement in Newhall Land, in which he stated, "As a Unit Holder and class representative, I believe the [attorneys'] fee sought is fair considering the amount of work done and the quality of the result obtained."

Overt Act No. 3: On or about January 18, 1989, Milberg Weiss obtained attorneys' fees of $1,815,295 in Newhall Land.

Overt Act No. 4: In or about early 1989, defendant COOPERMAN and Cooperman Plaintiff 1 met with Partner B in Los Angeles, at which meeting Partner B told them that they would receive approximately 5% to 10% of Milberg Weiss's attorneys' fees in Newhall Land; that Milberg Weiss would pay COOPERMAN and Cooperman Plaintiff 1 5% to 10% of Milberg Weiss's attorneys' fees in future cases that they brought to the firm; and that COOPERMAN and Cooperman Plaintiff 1 should purchase stocks in companies, such as banks and hi-tech firms, in order to position Milberg Weiss and themselves to file class action lawsuits in the future.

Overt Act No. 5: In or about early January 1989, defendant COOPERMAN and Partner B met in Los Angeles and discussed different methods by which Milberg Weiss could secretly pay COOPERMAN his kickback share of the firm's attorneys' fees in Newhall Land.

Overt Act No. 6: On or about January 24, 1989, defendant COOPERMAN met with Partner A in Los Angeles to discuss

25

how Partner A would disguise the <u>Newhall Land</u> kickback payment to COOPERMAN as a refundable option payment on COOPERMAN's Picasso painting known as "Reclining Nude."

Overt Act No. 7: On or about January 27, 1989, defendant COOPERMAN received Partner A's personal check in the amount of $175,000 payable to COOPERMAN, falsely described thereon as for "Refundable Option on Picasso."

Overt Act No. 8: Thereafter in early 1989, defendant COOPERMAN paid Cooperman Plaintiff 1 his share of the kickback proceeds that COOPERMAN had received in <u>Newhall Land</u> from Partner A.

Overt Act No. 9: In late January or early February 1989, defendant COOPERMAN and Bershad had a telephone conversation during which they discussed having Milberg Weiss funnel monies to COOPERMAN through Cooperman Brother-in-Law B, disguised as phony fees for services paid by Milberg Weiss to Cooperman Brother-in-Law B, which COOPERMAN would use to reimburse himself for returning the phony $175,000 option payment to Partner A.

Overt Act No. 10: On or about March 27, 1989, Milberg Weiss, Bershad, Schulman, and others caused to be sent to Cooperman Brother-in-Law B a letter signed by Schulman falsely describing Cooperman Brother-in-Law B as a "consultant" to Milberg Weiss in a case called "<u>Liberty All-Star Equity Fund</u>."

Overt Act No. 11: On or about March 29, 1989, Milberg Weiss, Bershad, and others caused to be sent to Cooperman Brother-in-Law B a $35,000 check, with a cover letter signed by Bershad falsely describing the check as his "retainer"

for "Liberty Allstar."

Overt Act No. 12: On or about April 21, 1989, Milberg Weiss, Bershad, and others caused to be sent to Cooperman Brother-in-Law B a $25,000 check, with a cover letter signed by Bershad falsely describing the payment as his "retainer" for a case called "Brinkmann Instruments, Inc."

Overt Act No. 13: On or about May 23, 1989, Milberg Weiss, Bershad, and others caused to be sent to Cooperman Brother-in-Law B a $40,000 check, with a cover letter signed by Bershad falsely describing the payment as his "retainer" for a case called "MDC Corporation."

Overt Act No. 14: On or about May 26, 1989, Milberg Weiss, Bershad, and others caused to be sent to Cooperman Brother-in-Law B a $40,000 check, with a cover letter signed by Bershad falsely describing the payment as his "retainer" for a case called "Imperial Bank."

Overt Act No. 15: On or about June 15, 1989, defendant COOPERMAN sent a sham letter to Partner A that purported to confirm that COOPERMAN would return Partner A's $175,000 refundable option payment to him because Partner A had decided not to purchase COOPERMAN's Picasso painting, and included COOPERMAN's check for $65,000 to Partner A as a purported partial return of the option payment.

Overt Act No. 16: On or about June 19, 1989, defendant COOPERMAN caused Cooperman Brother-in-Law B to pay $65,000 from the proceeds of the Milberg Weiss checks he had previously received to a company controlled and owned by COOPERMAN called Barrock Investment Group ("Barrock"), so that COOPERMAN could

reimburse himself for the funds he used to repay Partner A.

Overt Act No. 17: On or about June 24, 1989, defendant COOPERMAN caused Cooperman Brother-in-Law B to pay $60,000 from the proceeds of the Milberg Weiss checks he previously received to Barrock, so that COOPERMAN could reimburse himself for the funds he used to repay Partner A.

Overt Act No. 18: On or about August 18, 1989, defendant COOPERMAN sent Partner A a $35,000 check, purportedly as partial return of Partner A's art option payment.

Overt Act No. 19: On or about August 28, 1989, defendant COOPERMAN caused Cooperman Brother-in-Law B to pay $10,000 to Barrock from the proceeds of the Milberg Weiss checks he had received, so that COOPERMAN could use the funds to repay Partner A.

Overt Act No. 20: On or about September 27, 1989, defendant COOPERMAN sent Partner A a $25,000 check, purportedly as partial return of Partner A's art option payment.

Overt Act No. 21: On or about December 6, 1989, defendant COOPERMAN sent Partner B a letter that enclosed copies of the three checks, totaling $125,000, that COOPERMAN had previously paid to Partner A in partial refund of the phony art option payment, so that Partner B could confirm how much COOPERMAN had left to repay Partner A.

Overt Act No. 22: On or about February 8, 1990, Milberg Weiss, Bershad, and others caused to be sent to Cooperman Brother-in-Law B a $35,000 check, with a cover letter signed by Bershad falsely describing the payment as his "retainer" in connection with investigation of a company called

1  "Lone Star Industries."

2        Overt Act No. 23: On or about February 14, 1990,
3  defendant COOPERMAN caused Cooperman Brother-in-Law B to pay
4  $35,0000 to Barrock from the proceeds of the Milberg Weiss checks
5  he had received, so that COOPERMAN could use the funds to repay
6  Partner A.

7        Overt Act No. 24: On or about November 15, 1990,
8  defendant COOPERMAN sent Bershad a letter stating, "I faxed
9  [Partner B] copies of 3 checks in 12/89 but so far have not been
10 able to find my copy of those copies – I think he sent them on to
11 you."  COOPERMAN's letter further advised Bershad that according
12 to COOPERMAN's check records, "after 12/89, [Partner A] sent
13 [Cooperman Brother-in-Law B] another $35,000, & I think I may
14 still owe that to [Partner A].  Let me know if this all agrees
15 with your records."

16       Overt Act No. 25: On or about February 15, 1991,
17 defendant COOPERMAN caused Cooperman Brother-in-Law B to pay
18 $33,250 to Barrock from the proceeds of the Milberg Weiss checks
19 he had received, so that COOPERMAN could reimburse himself for
20 the funds used to repay Partner A.

21 **B.    Consolidated Kickback Payments re _Farmers_, _Smithkline_,**
22 **_Aristech_, _Jepson_, and _Georgia Gulf_**

23       Overt Act No. 26: On or about March 25, 1991, defendant
24 COOPERMAN met with Partner B and discussed the amounts of
25 attorneys' fees that Milberg Weiss had obtained in lawsuits
26 referred to as Farmers, Smithkline, Aristech, Jepson, and Georgia
27 Gulf, and the amount of those fees that Milberg Weiss would pay
28 to COOPERMAN in light of an offsetting $35,000 balance that they
   understood COOPERMAN still owed Partner A for his phony art

                              29

1 || option payment to COOPERMAN.

2 ||         Overt Act No. 27: On or about March 25, 1991, during

3 || his meeting with defendant COOPERMAN, Partner B provided $16,000

4 || in cash to COOPERMAN in partial payment of the kickbacks owed by

5 || Milberg Weiss for COOPERMAN and Cooperman Plaintiff 1 serving as

6 || named plaintiffs in Smithkline, Aristech, Jepson, and Georgia

7 || Gulf, as well as for COOPERMAN providing inside information to

8 || Milberg Weiss for its use in Farmers (collectively, with Newhall

9 || Land, the "Pre-1991 Settled Cases").

10 ||         Overt Act No. 28: On or about March 25, 1991, defendant

11 || COOPERMAN and Partner B caused to be sent by fax from

12 || Milberg Weiss's office to COOPERMAN's residence in Los Angeles a

13 || hand written document reflecting their discussion and agreement

14 || concerning Milberg Weiss's attorneys' fees and the amounts of the

15 || kickbacks owed to COOPERMAN for the Pre-1991 Settled Cases, which

16 || included hand written notes indicating that the kickbacks owed

17 || COOPERMAN were reduced by $35,000 that COOPERMAN still owed

18 || Partner A; that the kickback payment obligation for Newhall Land

19 || was "Done"; that there had been "16 PAID"; and that there was

20 || $10,000 remaining to be paid COOPERMAN and Cooperman Plaintiff 1

21 || for these cases.

22 ||         Overt Act No. 29: On or about March 25, 1991, defendant

23 || COOPERMAN gave Cooperman Plaintiff 1 a portion of the $16,000

24 || cash kickback payment that COOPERMAN had received from Partner B,

25 || as Cooperman Plaintiff 1's share of the kickbacks for the Pre-

26 || 1991 Settled Cases.

27 ||         Overt Act No. 30: In or about July 1991, defendant

28 || COOPERMAN discussed with Partner B that Milberg Weiss would pay

30

the balance of the kickbacks owed to COOPERMAN on the Pre-1991 Settled Cases through Tierney, using fees coming in to Milberg Weiss from its shareholder lawsuit relating to Northrop.

Overt Act No. 31: On or about July 15, 1991, at defendant COOPERMAN's direction, Tierney sent Partner B a sham statement for $20,000 for "Consultation" by Tierney in "Northrop Shareholder Lawsuit."

Overt Act No. 32: On or about August 20, 1991, at defendant COOPERMAN's direction, Milberg Weiss and Bershad issued a check for $20,000 to Tierney, with a cover letter signed by Partner B falsely describing the check as in payment of Tierney's "invoice of July 15, 1991 relating to the Northrop Shareholder Litigation."

Overt Act No. 33: On or about August 22, 1991, Tierney provided a $12,000 check to defendant COOPERMAN, falsely described by Tierney as "return of retainer," thereby providing to COOPERMAN the balance of kickback funds that Milberg Weiss owed for the Pre-1991 Settled Cases.

Overt Act No. 34: On or about August 30, 1991, defendant COOPERMAN gave to Cooperman Plaintiff 1 a check in the amount of $2,500, in partial payment of his kickback share for the Pre-1991 Settled Cases.

Overt Act No. 35: On or about August 31, 1991, defendant COOPERMAN gave Cooperman Plaintiff 1 a check in the amount of $2,900, as final payment of his kickback share for the Pre-1991 Settled Cases.

/ / /

/ / /

1  C.   *Cineplex Odeon*

2           Overt Act No. 36: On or about April 28, 1989, defendant

3  COOPERMAN, Milberg Weiss, and others caused to be filed a class

4  action complaint in Cineplex Odeon, naming COOPERMAN as a

5  plaintiff.

6           Overt Act No. 37: On or about December 31, 1991,

7  Milberg Weiss obtained attorneys' fees of $213,767 in Cineplex

8  Odeon.

9           Overt Act No. 38: On or about January 8, 1992, at

10  defendant COOPERMAN's direction, Milberg Weiss and Bershad caused

11  a $21,376 check to be issued to Tierney, falsely described by

12  Bershad in a cover letter as his "referral fee" in Cineplex

13  Odeon.

14           Overt Act No. 39: On or about January 20, 1992, at

15  COOPERMAN's direction, Tierney paid defendant COOPERMAN a $10,000

16  check, falsely described as a "loan" to COOPERMAN, from the

17  proceeds of the Milberg Weiss check described in

18  Overt Act No. 38.

19  D.   *One Bancorp*

20           Overt Act No. 40: On or about August 22, 1989,

21  defendant COOPERMAN purchased 50 shares of stock in The One

22  Bancorp, Inc. to position Milberg Weiss and himself to file a

23  lawsuit regarding that company.

24           Overt Act No. 41: On or about August 22, 1989,

25  defendant COOPERMAN sent a letter to Partner B and Schulman that

26  referenced One Bancorp, stating, "I believe this company will be

27  bankrupt within a few months.  They just suspended dividend, and

28  announced $10M quarterly loss.  Let's watch for a few weeks

32

1  before filing, as the stock is selling for approximately what I

2  paid ($5+) but will be a lot less soon.  Clearly <u>poor</u> management

3  Steve."

4      <u>Overt Act No. 42</u>: On or about December 28, 1989,

5  defendant COOPERMAN, Milberg Weiss, and others caused to be filed

6  a class action complaint in <u>One Bancorp</u>, naming COOPERMAN as a

7  plaintiff.

8      <u>Overt Act No. 43</u>: On or about September 13, 1990,

9  defendant COOPERMAN subscribed, under penalty of perjury, to a

10  declaration in <u>One Bancorp</u> in which he falsely stated that: (a)

11  he did not recall the exact circumstances of his purchase of One

12  Bancorp stock but he believed at the time of his purchase that it

13  represented a good value; and (b) only after the price of One

14  Bancorp stock dropped precipitously and adverse information was

15  disclosed did COOPERMAN decide to contact Milberg Weiss.

16      <u>Overt Act No. 44</u>: On or about July 9, 1991, in an under

17  oath deposition in <u>One Bancorp</u>, defendant COOPERMAN falsely

18  stated that he was not aware of any possible conflicts of

19  interest between himself and other class members.

20      <u>Overt Act No. 45</u>: On or about August 9, 1993,

21  Milberg Weiss obtained attorneys' fees of $393,325 in <u>One</u>

22  <u>Bancorp</u>.

23      <u>Overt Act No. 46</u>: On or about August 16, 1993, at

24  defendant COOPERMAN's direction, Milberg Weiss and Bershad issued

25  a check in the amount of $39,332.46 to Purtich's firm, with a

26  cover letter signed by Bershad falsely describing the payment as

27  "your interest in the fee earned by my firm."

28  / / /

1        <u>Overt Act No. 47</u>:  In or about August 1993, defendant
2   COOPERMAN caused Purtich to use the proceeds of the check
3   described in Overt Act No. 46 to satisfy legal fees that
4   COOPERMAN owed to Purtich's law firm.

5   **E.   <u>*Jan Bell*</u>**

6        <u>Overt Act No. 48</u>: On or about December 6, 1989,
7   defendant COOPERMAN sent to Partner B a letter referencing four
8   companies, including Jan Bell Marketing, and stating, "I believe
9   there are major problems with all 4."

10       <u>Overt Act No. 49</u>: On or about December 6, 1989,
11  defendant COOPERMAN sent to Schulman a letter referencing four
12  companies, including Jan Bell Marketing, and stating, "4 of my
13  holdings have what I believe to be major problems – I discussed
14  with [Partner B], he can give you details."

15       <u>Overt Act No. 50</u>: On or about December 7, 1989,
16  defendant COOPERMAN purchased 50 shares of stock in Jan Bell to
17  position Milberg Weiss and himself to file a lawsuit regarding
18  the company.

19       <u>Overt Act No. 51</u>: On or about March 7, 1990, defendant
20  COOPERMAN, Milberg Weiss, and others caused to be filed a class
21  action complaint in <u>Jan Bell</u>, naming COOPERMAN as a plaintiff.

22       <u>Overt Act No. 52</u>: On or about March 22, 1991, in an
23  under oath deposition in <u>Jan Bell</u>, defendant COOPERMAN falsely
24  testified, among other things, that in other lawsuits in which he
25  had been a named plaintiff for Milberg Weiss he had never
26  received any money other than his shareholder portion of the
27  settlements, and that "whatever the court awards as compensation
28  or a judgment," he would "collect [his] share based on how much

                                  34

stock [he] bought."

Overt Act No. 53: On or about July 21, 1992, at defendant COOPERMAN's direction, Milberg Weiss and Bershad caused to be sent to Purtich a $19,363 check, with a cover letter by Bershad falsely stating that the payment was "in consideration of your consultation and referral of Dr. Cooperman to our firm."

Overt Act No. 54: On or about July 22, 1992, defendant COOPERMAN caused Purtich to use the proceeds of the Milberg Weiss check described in Overt Act No. 53 to satisfy legal fees that COOPERMAN owed to Purtich's law firm.

F.  *American Continental/Lincoln Savings*

Overt Act No. 55: On or about January 30, 1989, with the encouragement of defendant COOPERMAN and acting in consultation with Partner B, Cooperman Plaintiff 1 purchased 100 shares of stock in American Continental Corporation ("ACC") for the purpose of positioning Milberg Weiss and himself to file a lawsuit regarding that company.

Overt Act No. 56: On or about April 24, 1989, Milberg Weiss, Partner B, and others caused to be filed a class action complaint in American Continental/Lincoln Savings, naming Cooperman Plaintiff 1 as a plaintiff.

Overt Act No. 57: On or about November 2, 1989, Cooperman Plaintiff 1, acting in concert with defendant COOPERMAN, Milberg Weiss, Partner B, and others, subscribed under penalty of perjury to Answers to Interrogatories in American Continental/Lincoln Savings, which falsely concealed that Partner B had discussed with Cooperman Plaintiff 1 and defendant

1  COOPERMAN purchasing ACC stock to position Milberg Weiss and

2  Cooperman Plaintiff 1 to file a lawsuit regarding that company.

3     Overt Act No. 58: On or about April 22, 1991, in an

4  under oath deposition in American Continental/Lincoln Savings,

5  Cooperman Plaintiff 1, acting in concert with defendant

6  COOPERMAN, Milberg Weiss and others, falsely stated, among other

7  things, that he would not receive any payment from any source in

8  exchange for serving as a named plaintiff in American

9  Continental/Lincoln Savings, and that he did not receive any

10  compensation in Newhall Land beyond that which he received as a

11  member of the class.

12     Overt Act No. 59: In or about October 1992, defendant

13  COOPERMAN told Purtich that Milberg Weiss would be sending

14  Purtich a substantial amount of money, which was COOPERMAN's

15  share of Milberg Weiss's attorneys' fees in American

16  Continental/Lincoln Savings.

17     Overt Act No. 60: On or about October 21, 1992, at

18  defendant COOPERMAN's direction, Milberg Weiss and Bershad issued

19  a $440,000 check to Purtich's firm, accompanied by a cover letter

20  from Bershad falsely stating the check was Purtich's

21  "compensation for work and responsibility in our most recent

22  endeavor."

23     Overt Act No. 61: On or about October 23, 1992,

24  defendant COOPERMAN caused Purtich to forward $215,000 of the

25  proceeds of the Milberg Weiss $440,000 check described in

26  Overt Act No. 60 to COOPERMAN.

27     Overt Act No. 62: On or about October 26, 1992,

28  defendant COOPERMAN paid Cooperman Plaintiff 1 $129,000 of the

1  $215,000 forwarded by Purtich as described in Overt Act No. 61,

2  as his share of the kickback that COOPERMAN had received in

3  <u>American Continental/Lincoln Savings</u>.

4  **G.** *Fairfield Communities*

5          <u>Overt Act No. 63</u>: On or about June 29, 1990, defendant

6  COOPERMAN, Milberg Weiss, and others caused to be filed with the

7  court a class action complaint in <u>Fairfield Communities</u>, naming

8  COOPERMAN as a plaintiff.

9          <u>Overt Act No. 64</u>: On or about November 29, 1990,

10  defendant COOPERMAN, acting in concert with Milberg Weiss,

11  subscribed under penalty of perjury to Answers to Interrogatories

12  in <u>Fairfield Communities</u>, falsely stating, among other things,

13  that COOPERMAN had "at no time received any bonus or incentive

14  payment as a result of being named as a plaintiff in any class or

15  derivative actions."

16          <u>Overt Act No. 65</u>: On or about July 17, 1990, in an

17  under oath deposition in <u>Fairfield Communities</u>, defendant

18  COOPERMAN, acting in concert with Milberg Weiss and others,

19  falsely denied that he had received any benefit in connection

20  with <u>Newhall Land</u> other than those paid to all shareholders.

21          <u>Overt Act No. 66</u>: On or about July 16, 1993, Schulman

22  represented to the court, in support of a request for attorneys'

23  fees in <u>Fairfield Communities</u>, that Milberg Weiss was not seeking

24  any incentive bonus award on behalf of defendant COOPERMAN, and

25  that COOPERMAN was "satisfied to participate as a class member in

26  the recovery of his claim."

27

28

37

1        <u>Overt Act No. 67</u>: On or about August 10, 1993,

2    Milberg Weiss obtained approximately $249,962.69 in attorneys'

3    fees in <u>Fairfield Communities</u>.

4        <u>Overt Act No. 68</u>: On or about August 16, 1993, at

5    defendant COOPERMAN's direction, Milberg Weiss and Bershad caused

6    to be issued to Purtich's firm a $24,996.27 check, along with a

7    cover letter signed by Bershad falsely stating that the check

8    "represents your interest in the fee earned by my firm in"

9    <u>Fairfield Communities</u>.

10       <u>Overt Act No. 69</u>: In or about October 1993, defendant

11   COOPERMAN caused Purtich to use the proceeds of the check

12   described in Overt Act No. 68 to satisfy legal fees that

13   COOPERMAN owed to Purtich's firm.

14   **H.   _Columbia Savings_**

15       <u>Overt Act No. 70</u>: On or about November 9, 1989,

16   defendant COOPERMAN, Milberg Weiss, and others caused to be filed

17   a class action complaint in <u>Columbia Savings</u>, naming COOPERMAN as

18   a plaintiff.

19       <u>Overt Act No. 71</u>: On or about January 11, 1990,

20   Milberg Weiss, Partner B, and others caused to be falsely

21   represented to the court in <u>Columbia Savings</u>, in support of a

22   motion for class certification, that the interests of defendant

23   COOPERMAN in the lawsuit "do not in any manner conflict with, nor

24   are they antagonistic to, those of the class."

25       <u>Overt Act No. 72</u>: On or about February 28, 1990,

26   defendant COOPERMAN, acting in concert with Milberg Weiss,

27   Partner B, and others, subscribed under penalty of perjury to

28   interrogatory responses in <u>Columbia Savings</u> in which, among other

things, he falsely stated in response to a question whether he had any "agreement, arrangement, expectation, intention, or understanding . . . with respect to receiving any payment or consideration different from the payment or consideration that may be received by other members of the putative class as a result of this litigation" the following: "I will not be treated differently than any other class member regarding any recovery."

Overt Act No. 73: On or about June 28, 1990, in an under oath deposition in the Columbia Savings lawsuit, defendant COOPERMAN, acting in concert with Milberg Weiss and others, concealed his kickback arrangement with Milberg Weiss.

Overt Act No. 74: On or about December 10, 1992, defendant COOPERMAN sent Partner B a letter, enclosing a court notice that referenced a hearing on award of attorneys' fees in Columbia Savings, in which he asked Partner B, "I received this today – has the hearing for atty's fees happened yet?  If so, how did we do?  Please let me know – also, is there a payout date?"

Overt Act No. 75: On or about December 28, 1993, Milberg Weiss obtained approximately $3,926,452 in attorneys' fees in Columbia Savings.

Overt Act No. 76: On or about March 31, 1994, at defendant COOPERMAN's direction, Milberg Weiss and Bershad caused to be sent to Purtich a $200,000 check, along with a cover letter signed by Bershad falsely describing the payment as "a portion of your entitlement" to the attorneys' fees in Columbia Savings.

Overt Act No. 77: In or about April 1994, defendant COOPERMAN caused Purtich to use the proceeds of the $200,000

39

1  check described in Overt Act No. 76 to satisfy legal fees that
2  COOPERMAN owed to Purtich's law firm.

3       Overt Act No. 78: On or about July 26, 1994,
4  Milberg Weiss obtained approximately $8,210,164 in attorneys'
5  fees in Columbia Savings.

6       Overt Act No. 79: On or about July 27, 1994, at
7  defendant COOPERMAN's direction, Milberg Weiss and Bershad caused
8  to be sent to Purtich a $200,000 check, along with a cover letter
9  signed by Bershad falsely representing the payment to be "your
10 current entitlement" to the attorneys' fees in Columbia Savings.

11      Overt Act No. 80: In or about July 1994, defendant
12 COOPERMAN caused Purtich to use the proceeds of the $200,000
13 check described in Overt Act No. 79 to satisfy legal fees that
14 COOPERMAN owed to Purtich's law firm.

15      Overt Act No. 81: On or about September 22, 1994, at
16 defendant COOPERMAN's direction, Milberg Weiss and Bershad caused
17 to be sent to Purtich a $191,278 check, along with a cover letter
18 signed by BERSHAD describing the payment to be "in furtherance of
19 our prior arrangement" concerning Columbia Savings.

20      Overt Act No. 82: In or about September 1994, defendant
21 COOPERMAN caused Purtich to use the proceeds of the check
22 described in Overt Act No. 81 to satisfy legal fees that
23 COOPERMAN owed to Purtich's law firm.

24 I.   *SCI-Television*

25      Overt Act No. 83: On or about March 10, 1994, defendant
26 COOPERMAN, Milberg Weiss, Partner B, and others caused to be
27 filed a verified class action complaint in SCI-Television, naming
28 COOPERMAN as a plaintiff.

40

1      Overt Act No. 84: On or about March 21, 1994, in an

2   under oath deposition in SCI-Television, defendant COOPERMAN

3   falsely stated that he had never been compensated for appearing

4   as a plaintiff in a class action case.

5      Overt Act No. 85: On or about November 11, 1994,

6   defendant COOPERMAN, acting in concert with Milberg Weiss and

7   others, executed a declaration under penalty of perjury to be

8   filed with the court in SCI-Television, which falsely stated,

9   among other things, that there were no legal differences in

10  COOPERMAN's status as a class member and those of other persons

11  within the class; there were no unique legal issues pertaining to

12  COOPERMAN as a class representative; and COOPERMAN "anticipate[d]

13  receiving [his] pro rata share, and no more, of the damages

14  received by this class."

15     Overt Act No. 86: On or about November 1, 1995, at

16  defendant COOPERMAN's direction, Milberg Weiss and Bershad caused

17  to be sent to Purtich a $100,000 check, with a cover letter

18  signed by Bershad falsely describing the check as a payment

19  "towards your participation" in SCI-Television.

20     Overt Act No. 87: On or about November 2, 1995,

21  Milberg Weiss obtained approximately $3,218,329.50 in attorneys'

22  fees in SCI-Television.

23     Overt Act No. 88: On or about November 16, 1995, at

24  defendant COOPERMAN's direction, Milberg Weiss and Bershad caused

25  to be sent to Purtich an $81,846 check, with a cover letter

26  signed by Bershad falsely describing the payment as being "with

27  regard to your participation as counsel in [SCI Television]."

28

1   <u>Overt Act No. 89</u>: In or about November 1995, defendant

2   COOPERMAN caused Purtich to use the proceeds of the checks

3   described in Overt Acts Nos. 86 and 88 to satisfy legal fees that

4   COOPERMAN owed to Purtich's law firm.

5   **J.   *Community Psychiatric***

6   <u>Overt Act No. 90</u>: On or about September 30, 1991,

7   defendant COOPERMAN, Milberg Weiss, and others caused to be filed

8   a class action complaint in <u>Community Psychiatric</u>, naming

9   COOPERMAN as a plaintiff.

10   <u>Overt Act No. 91</u>: On or about February 29, 1996,

11   Milberg Weiss obtained approximately $4,123,000 in attorneys'

12   fees in <u>Community Psychiatric</u>.

13   <u>Overt Act No. 92</u>: On or about November 11, 1996, at

14   defendant COOPERMAN's direction, Milberg Weiss and Bershad caused

15   to be provided to COOPERMAN a $114,891.50 check, made payable to

16   Tierney, relating to <u>Community Psychiatric</u>.

17   <u>Overt Act No. 93</u>: On or about November 12, 1996,

18   defendant COOPERMAN deposited the $114,891.50 check described in

19   Overt Act No. 92 into his personal bank account.

20   **K.   *Heart Technology***

21   <u>Overt Act No. 94</u>: On or about August 11, 1995, with the

22   encouragement of defendant COOPERMAN, Cooperman Plaintiff 2

23   purchased 100 shares of stock in Heart Technology Inc., for the

24   purpose of positioning Milberg Weiss and himself to file a

25   lawsuit regarding that company.

26   <u>Overt Act No. 95</u>:  On or about August 30, 1995,

27   Milberg Weiss, Bershad, Schulman, and others caused to be filed a

28

42

1 | class action complaint in <u>Heart Technology</u>, naming Cooperman
2 | Plaintiff 2 as a plaintiff.

3 |     <u>Overt Act No. 96</u>: On or about March 13, 1997, Cooperman
4 | Plaintiff 2, acting in concert with defendant COOPERMAN, Milberg
5 | Weiss and others, subscribed under penalty of perjury to an
6 | affirmation in which he falsely stated that he had "no claim or
7 | interest that is adverse to Heart [Technology] or its
8 | stockholders."

9 |     <u>Overt Act No. 97</u>: On or about May 5, 1997,
10 | Milberg Weiss obtained approximately $198,589.63 in attorneys'
11 | fees in <u>Heart Technology</u>.

12 |     <u>Overt Act No. 98</u>: On or about May 6, 1997, at defendant
13 | COOPERMAN's direction, Milberg Weiss, Bershad, and others caused
14 | to be sent to COOPERMAN a check payable to Purtich in the amount
15 | of $19,858.96, representing 10% of the fees awarded in <u>Heart</u>
16 | <u>Technology</u>.

17 |     <u>Overt Act No. 99</u>: On or about May 8, 1997, defendant
18 | COOPERMAN caused the $19,858.96 check described in
19 | Overt Act No. 98 to be deposited into his personal bank account.

20 |     <u>Overt Act No. 100</u>: On or about May 14, 1997, defendant
21 | COOPERMAN caused to be sent to Purtich a check in the amount of
22 | $19,858.96.

23 |     <u>Overt Act No. 101</u>: In or about May 1997, defendant
24 | COOPERMAN caused Purtich to use proceeds of the check described
25 | in Overt Act No. 100 to satisfy legal fees owed to Purtich by
26 | COOPERMAN.

27 |     <u>Overt Act No. 102</u>: On or about October 3, 1997,
28 | defendant COOPERMAN caused Purtich to pay Cooperman Plaintiff 2

1  $10,000, representing Cooperman Plaintiff 2's share of the

2  Milberg Weiss kickback in Heart Technology.

3  **L.   *Cetus***

4          Overt Act No. 103: On or about July 11, 1990, defendant

5  COOPERMAN purchased stock in Cetus Securities, for the purpose of

6  positioning Milberg Weiss and himself to file a lawsuit regarding

7  that company.

8          Overt Act No. 104: On or about July 12, 1990, defendant

9  COOPERMAN sent a letter to Partner B advising him that COOPERMAN

10  expected a "negative bombshell" to be announced about Cetus.

11          Overt Act No. 105: On or about July 20, 1990, defendant

12  COOPERMAN, Milberg Weiss, and others caused to be filed a class

13  action complaint in Cetus, naming COOPERMAN as a plaintiff.

14          Overt Act No. 106: On or about October 28, 1991,

15  Milberg Weiss obtained attorneys' fees of $666,576 in Cetus.

16          Overt Act No. 107: On or about November 6, 1991,

17  Milberg Weiss obtained additional attorneys' fees of $1,118,489

18  in Cetus.

19          Overt Act No. 108: On or about November 20, 1991, at

20  defendant COOPERMAN's direction, Milberg Weiss and Bershad caused

21  to be sent to Tierney a $178,506.56 check, with a cover letter

22  signed by Bershad falsely describing the payment as a "referral

23  fee" that Tierney earned in Cetus.

24          Overt Act No. 109: On or about November 21, 1991, at

25  defendant COOPERMAN's direction, Tierney provided to COOPERMAN a

26  $100,000 check, falsely described as a "Loan," from the proceeds

27  of the Milberg Weiss check described in Overt Act No. 108.

28

44

1        <u>Overt Act No. 110</u>: On or about July 19, 1993, defendant

2   COOPERMAN faxed to Partner B a copy of the $35.28 check COOPERMAN

3   had received as his pro rata share of the class settlement in

4   <u>Cetus</u>, along with a note addressed to Partner B stating, "<u>Cetus</u>

5   settled . . . justice prevails!"

6   **M.**   **Other Overt Acts**

7        <u>Overt Act No. 111</u>: On or about November 8, 1989,

8   Schulman prepared a memorandum for Partner B that referenced the

9   "Cooperman/[Cooperman Plaintiff 1] Litigation" and described the

10  current status of 13 cases pursued by Milberg Weiss in which

11  COOPERMAN and Cooperman Plaintiff 1 were named plaintiffs.

12       <u>Overt Act No. 112</u>: On or about November 16, 1990, in

13  his under oath deposition as a plaintiff in <u>Valley National</u>,

14  defendant COOPERMAN, acting in concert with Milberg Weiss and

15  others, falsely denied that he had received any payment for

16  serving as a plaintiff in <u>Newhall Land</u>, and concealed his

17  expectation that Milberg Weiss would pay him for being a class

18  representative in <u>Valley National</u>.

19       <u>Overt Act No. 113</u>: On or about January 9, 1991,

20  defendant COOPERMAN sent to Milberg Weiss and Partner B a

21  handwritten list of 35 filed and potential class actions and

22  shareholder derivative lawsuits for which COOPERMAN expected to

23  be paid kickbacks by Milberg Weiss, comprised of cases in which

24  the COOPERMAN Plaintiffs and other plaintiffs provided by

25  COOPERMAN participated, as well as matters in which COOPERMAN

26  provided information for use by Milberg Weiss to develop the

27  case, with COOPERMAN's notes to Partner B indicating COOPERMAN's

28

1  understanding of the amounts of attorneys' fees Milberg Weiss had
2  received for those cases.

3          Overt Act No. 114: On or about January 9, 1991,
4  Partner B had his secretary type up a "chart" reflecting all the
5  information included in the hand written list of cases that
6  defendant COOPERMAN had provided him, described in
7  Overt Act No. 113.

8          Overt Act No. 115: On or about March 9, 1992, at the
9  direction of Partner B, another Milberg Weiss attorney prepared
10 and provided to Purtich written legal research, analysis and
11 arguments to be used by Purtich to seek dismissal of a civil RICO
12 claim asserted against COOPERMAN in the Paul Revere matter, which
13 legal services were provided by Milberg Weiss and Partner B at no
14 charge to COOPERMAN.

15         Overt Act No. 116: On or about May 21, 1992, in
16 response to an April 27, 1992 National Law Journal ("NLJ")
17 article that cited defendant COOPERMAN's serving as a plaintiff
18 in 19 shareholder lawsuits filed in federal and state courts in
19 Los Angeles and allegations against COOPERMAN in the Paul Revere
20 matter that he had bought 15 disability insurance policies from
21 15 different insurance companies without telling them about his
22 heart condition and was using part of the benefits to create
23 litigation, Partner B wrote a letter to the Editor-in-Chief of
24 the NLJ in which Partner B insisted, "Dr. Cooperman's reputation
25 and character are impeccable and any inference to the contrary
26 which may be drawn from your article is unfair and unwarranted."

27         Overt Act No. 117: On or about July 3, 1992, defendant
28 COOPERMAN, acting in concert with Milberg Weiss and others,

subscribed under penalty of perjury to answers to interrogatories directed to him as a plaintiff in a state class action relating to MBNA Bank, which falsely stated that COOPERMAN had never, directly or indirectly, received payment from Milberg Weiss.

Overt Act No. 118: On or about March 19, 1994, defendant COOPERMAN sent Partner B a letter, enclosing a court notice that referenced a pending settlement hearing in Sunrise Technologies, in which he asked Partner B, "got this today – This was case I brought to you & you said I'd be treated as plaintiff – how did we make out?  Steve."

Overt Act No. 119: On or about September 22, 1994, at defendant COOPERMAN's direction, Milberg Weiss, Bershad, Partner B, and others caused to be sent to Purtich a $12,800 check, with a cover letter signed by Bershad falsely describing the payment to be "in furtherance of our prior arrangement" with respect to Sunrise Technologies.

Overt Act No. 120: On or about May 19, 1995, defendant COOPERMAN sent a letter to Bershad in which he stated, in reference to the MTC Electronics class action, "I brought this case to [Partner B] – we decided I should not be the named plaintiff, but [Partner B] told me he would treat case (referral-wise) as if I was the plaintiff, since I brought it to the firm. I believe the case has recently been settled.  Please check it out & let me know details.  I'll let you know who the referral lawyer should be when I know the amount."

Overt Act No. 121: On or about June 1, 1995, defendant COOPERMAN caused to be sent to Milberg Weiss and Partner B a letter stating, among other things, "Re: Infant Formula case –

47

please do ASAP - our share goes to [Purtich] - he's pressing me
for $ - please send me copy."

     Overt Act No. 122: On or about July 7, 1995, at
defendant COOPERMAN's direction, Milberg Weiss, Bershad, Partner
B, and others caused to be sent to Purtich a $25,868 check, with
a cover letter signed by Bershad falsely describing the payment
as Purtich's "share of attorney's fees with regard to [Infant
Formula]."

     Overt Act No. 123: On or about November 6, 1996,
defendant COOPERMAN, acting in concert with Milberg Weiss,
Bershad, Schulman, and others, signed under penalty of perjury a
certification to be filed with the district court in the Lawsuit
Steven Cooperman v. Individual, Inc., et al., 96-CV-12272, (D.
Ma.), in which COOPERMAN falsely stated that he would "not accept
any payment for serving as a representative party on behalf of a
class beyond plaintiff's pro rata share of any recovery, except

/ / /

/ / /

/ / /

1   such reasonable costs and expenses (including lost wages)

2   directly relating to the representation of the Class as ordered

3   or approved by the Court."

4

5

6   GEORGE S. CARDONA
    Acting United States Attorney

7

8   THOMAS P. O'BRIEN
    Assistant United States Attorney
9   Chief, Criminal Division

10  DOUGLAS A. AXEL
    Assistant United States Attorney
11  Deputy Chief, Major Frauds Section

12  RICHARD E. ROBINSON
    ROBERT J. McGAHAN
13  Assistant United States Attorneys
    Major Frauds Section

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

49

<u>CERTIFICATE OF SERVICE</u>

I, **Temeria Wylie,** declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of: **PLEA AGREEMENT FOR DEFENDANT STEVEN G. COOPERMAN**

service was:        **Russell M. Gioiella, Esq.**
                    **Litman, Asche & Gioiella LLP**
                    **45 Broadway Atrium**
                    **New York, NY 10017**

[] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[X] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[] By hand delivery addressed as follows:
**IN COURT**

[]By e-mail as follows:

[] By facsimile as follows

[] By messenger as follows:

[] By federal express as follows:

This Certificate is executed on **January 31, 2007**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

**TEMERIA WYLIE**