RUSSELL M. GIOIELLA (NY State Bar No. RMG-5898)
Litman, Asche & Gioiella, LLP
45 Broadway, 30th Floor
New York, NY  10006
Phone: (212) 809-4500
Fax: (212) 509-8403
Email: rmg@lagnyc.com

Attorneys for Defendant
Steven G. Cooperman, M.D.

JOHN S. CROUCHLEY (CA State Bar No. 115595)
Crowell & Moring, LLP
800 Wilshire Boulevard, Suite 500
Los Angeles, California  90017
Phone: (213) 622-4750
Fax: (213) 622-2690
Email: jcrouchley@crowell.com

Local Counsel

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br>   vs.<br><br>STEVEN G. COOPERMAN, M.D.,<br><br>                  Defendant. | **Case No.: CR 06-776-JFW**<br><br>**PRESENTENCE MEMORANDUM SUBMITTED ON BEHALF OF STEVEN COOPERMAN**<br><br>**Sentencing Date:  November 3, 2008**<br>**Time:          9:00 a.m.**<br>**Court: Hon. John F. Walter** |

# <u>TABLE OF CONTENTS</u>

<u>Pages</u>

A.   Mr. Cooperman's Medical Condition ........................................................... 4

    1.    Coronary Artery Disease ................................................................. 4

    2.    Gastrointestinal Illnesses ................................................................ 5

    3.    Tinnitus ........................................................................................ 11

B.   Mr. Cooperman's History with this Investigation ..................................... 12

    4.    Personal History ........................................................................... 19

C.   Conclusion ................................................................................................. 39

This Presentence Memorandum is submitted on behalf of Steven Cooperman, who is scheduled to appear before your Honor for sentencing on November 3, 2008 for one count of Conspiracy to Obstruct Justice in connection with the filing and prosecution of class action lawsuits by the Milberg Weiss firm. For the reasons set forth below, among others, we respectfully request that the Court exercise leniency and impose a non-custodial sentence upon Mr. Cooperman.

1.     Mr. Cooperman is 66 years of age and suffers from a long history of severe illnesses, which are manifesting themselves with increasing severity on a number of fronts.  The seriousness and variety of his physical illnesses, as well as the need for frequent and intensive supervision, medication and diagnostic procedures, make it virtually certain that Mr. Cooperman could not receive adequate medical care in a prison setting.

2.     While Mr. Cooperman is before the Court based upon a plea of guilty to his participation in the Milberg Weiss conspiracy to obstruct justice, in actuality, he is here because he violated his case disposition agreement, which had provided him with immunity for his participation in these crimes in exchange for his full disclosure of, and cooperation in, the investigation of this very conspiracy, cooperation which was unprecedented in its breadth, duration, intensity and ultimate productivity.  Ironically and tragically, in contrast to the mountainous substance and importance of his nine years of cooperation, the conduct which breached his plea agreement entailed a rather irrational and inexplicable error of judgment with no resultant or intended loss. While incarcerated, Mr. Cooperman, on occasion, signed the name of his doctor on medical forms that needed to be forwarded to his insurance companies on a periodic basis in order to continue disability payments that he had been receiving for 13 years and is still receiving at present.  Yet on other occasions during the very same time period, Mr. Cooperman

properly forwarded similar forms to his doctor who readily signed them and attested to his disability.  It is undisputed that Mr. Cooperman was in fact disabled and was entitled to these disability payments. Indeed, the insurance companies continue to pay him to this day, even though fully aware of his conduct.  Thus his behavior was wholly irrational, the result, we submit, of a serious error in judgment which, as will be explained below, was surely contributed to by the extreme conditions of his incarceration and traumatic familial situation all of which occurred, ironically, as a result of his cooperation in this very investigation.  We beseech the Court to consider the fact that the conduct which actually brings Mr. Cooperman before the Court was his participation in a crime of no loss and no intent to cause a loss.

Most importantly, notwithstanding the transgression which brings him here, there is one unassailable fact which puts his breach of the case disposition agreement in perspective. Mr. Cooperman **always** lived up to the most important obligation of his case disposition agreement – to tell the truth, completely and without any attempt to benefit by enhancing the guilt of others or minimizing the guilt of oneself. From the earliest days of his cooperation, when he was unsure whether he would even get a case disposition agreement let alone a departure motion, to the countless debriefing sessions involving the review of hundreds of thousands of documents, he always said what he knew, and when it came to the involvement of others, often what he **did not know and could not say**, immune to the seeming simplicity and usefulness of implicating others. We are confident that the prosecution, who we are sure meticulously investigated, scrutinized and corroborated his lengthy and detailed statements about events occurring over a ten year period, will attest to his steadfast honesty in this most important obligation.

3.     Even were Mr. Cooperman to be sentenced solely and exclusively for his participation, in the Milberg Weiss obstruction of justice scheme as if he were

2

simply "caught" by the Government and nine years of painful participation in their investigation never occurred, the sentences of his co-defendants, we believe, strongly argue for a sentence far below the minimum guideline range as recommended by the Probation Department which was unaware of the prior history.  Mr. Cooperman's culpability, **for acts which ended nearly ten years ago**, is a small fraction of that committed by others with whom the Court is thoroughly familiar. William Lerach, did not cooperate, did not plead early yet received a sentence of 24 months. Melvin Weiss received a 30 month sentence even though he continued his illegal conduct long after being made aware of the Government investigation.  The Probation Department recommended an 18 month sentence for David Bershad **without regard to his cooperation,** even though he was a major player in this long term conspiracy which extended far beyond Mr. Cooperman. These partners, who orchestrated, financed and concealed decades of illegal conduct and reaped literally hundreds of millions of dollars in fees as a result are culpable to an extent many times that of Mr. Cooperman.

    4.    Mr. Cooperman, long before he faced the prospect of criminal prosecution and while he was still a practicing physician, gave large amounts of his time, energy and financial resources to personal and institutional charitable causes. From performing countless surgeries at no cost for the elderly and infirm to donating large sums of money to charitable causes, Mr. Cooperman selflessly gave of his time, expertise, energy and money.  This impressive resume of charitable work led the Government to recommend, and the Court to grant, a one level departure at his sentencing in July 2001. We offer these facts simply to present a balanced portrait of Mr. Cooperman, who was often the brunt of enthusiastic and hyperbolic credibility attacks by targets who later begrudgingly admitted the truthfulness of his allegations.

## A.   <u>Mr. Cooperman's Medical Condition</u>

### 1.   Coronary Artery Disease

It would be a gross understatement to say that Mr. Cooperman is a very sick man.  He is 66 years old and suffered his first heart attack in 1984 at the age of 41. As a result of the consequent severe angina, he gave up his medical practice in 1989 and went on disability.  It is undisputed that his disability continues to today. Since that time, he has been diagnosed with atherosclerotic coronary artery disease. It has required Mr. Cooperman to take numerous medications for virtually the past 20 years.

However recently, his symptoms and disease have gotten much more severe, and on December 15, 2006, he underwent emergency coronary artery stenting at New York Presbyterian Cornell Medical Center.  He received three stents, but unfortunately, had other occluded arteries which "could not be revascularized and are still blocked." (Quotations in this section are to the Report of Dr. Richard Charney annexed hereto as Exhibit A).  Despite Mr. Cooperman's angioplasty and stents, he still has severe angina in his chest which occurs when he walks up stairs or any significant distances, for example, in an airport.  He has had numerous tests, including a recent ECG and nuclear stress test which confirms that his chest pain is the result of blocked arteries.

He also has "ischemic colitis" (which will be further discussed in the following section). Dr. Charney reports, "This blockage of the arteries supplying blood to the colon represents the diffuse nature of the atherosclerotic process in this patient".

In addition to taking a variety of medications, including Plavix, aspirin, Vytorin, Imdur, and Allopurino, Mr. Cooperman underwent a five week course of "counter pulsation" therapy. This procedure is designed to lessen angina on patients with occluded arteries.  The patient is literally squeezed by a machine in

4

between heart beats.  It is possible that he will have to undergo further treatments with this type of cardio-physical therapy.

As the letter of Dr. Charney makes clear, there is no doubt that Mr. Cooperman has a "shortened life expectancy". He has an increased risk of a "further coronary event, which includes heart attacks, admissions for chest pain, and death" which Dr. Charney estimates as a five to seven percent risk per year.

He cannot survive without his medication, and under normal circumstances, he would be monitored frequently by his doctor.  Perhaps most importantly, "there is a high likelihood that he will need recurrent angiograms, and possible further cardiac intervention, or possible coronary artery bypass surgery, in the next one to five years due to diffuse aggressive disease that this patient has shown". Needless to say, Mr. Cooperman "needs optimal follow-up care in order to give him the best chance of long-term survival". While it is possible that he could receive some of the medical attention he would need in a prison setting, it is highly unlikely that he would receive all the medical care he needs, and he certainly would not receive it from a doctor who is familiar with his myriad medical problems.

So far, we have only discussed his coronary issues.

## 2.    Gastrointestinal Illnesses

Mr. Cooperman has several serious gastrointestinal problems, one of which recently led to a hospitalization. The breadth and complexity of these diseases is best described by reproducing the letter from his longtime gastroenterologist, Dr. Peter Gardner (Exhibit B hereto):

> Dr. Steven Cooperman has been a patient of mine for many years.  He experienced a Boerhaave syndrome, rupture of the esophagus, many years ago and subsequently developed several significant gastroenterological problems for which I have been

5

following him.  I initially saw him over 10 years ago however the problems have been more severe, and thus I've seen him more often, over the last 3 years.

He has severe idiopathic gastroparesis, or slow emptying of the stomach, for which the cause is unknown. His symptoms include nausea, recurrent vomiting, abdominal pain, pressure in the upper abdomen and the inability to eat.  This has well documented on a gastric emptying study, which measures how long it takes the stomach to empty, and it was greater than 1000 minutes.  Under 90 minutes it is normal.  When it is over 1000 minutes, it cannot be calculated....  In fact, I have done multiple upper endoscopies on Dr. Cooperman and have to restrict his intake for two days prior to the endoscopy whereas for the average individual is four hours.  Needless to say this problem has been extraordinarily severe in nature.

As a result, he has been on the medication that we can only obtain from outside of this country.  Unfortunately, we had tried standard therapies yet there was no improvement.

Unfortunately as well, I have had to do multiple upper endoscopies on Dr. Cooperman looking for precancerous changes within his esophagus.  These will need to be done on a periodic (at least yearly) basis.  There have been different findings at times, but endoscopies pose a significant risk to Dr. Cooperman due

6

to his history of Boerhaave's syndrome.  Once the esophagus has been ruptured, any manipulation of the esophagus could result another rupture.  Dr. Cooperman is well aware of this and each and every time we weigh the benefits of the risks of doing the procedure.

Another intervening complication for any procedures and medical examination I want to perform is the fact that he has severe coronary disease with coronary stents.  Again, this limits my ability to do certain procedures, but we have unable to work around this problem to this point.

Most recently Dr. Cooperman was admitted to the hospital with severe abdominal pain.  On x-ray he had a very distended colon, and appeared to be atonic, i.e., not pushing fluids normally, and there was marked thickness and swelling in the wall of the bowel.  Colonoscopy revealed severe ischemic colitis, which is a condition where the lining of the bowel wall does not get enough blood flow and ulcers formed throughout the entire wall, bleeding occurs through much of it

He had an extraordinarily prolonged course of recovery.  We were unable to get Dr. Cooperman back on regular food and thus discharged him on a very limited diet.  He has slowly been able to increase it, but even now, eight weeks later, he is still unable to eat normally.

7

Dr. Cooperman's recovery has been extremely slow, he is certainly not fully recovered yet, this could return at any point in time. I have multiple pictures of this to document its severity. In fact I was careful to do multiple biopsies to document the severity and while this condition generally gets better on its own, it can result in removing part or all of the colon.

On a completely separate note I did perform an upper endoscopy on Dr. Cooperman due to the severe heartburn he gets and documented, just above the prior rupture of the esophagus, ulcers. He obviously requires medications for this as well.

In the past, in addition to the coronary stents (3) and repair of the esophageal perforation, Dr. Cooperman had repair of an abdominal hernia. His current medical problems include all of the above as well as angina.

Currently, he is on the Canadian medication (Domperidone) , Nexium, Toprol, Vytorin, Plavix and Aspirin.

I performed a wireless capsule study on Dr. Cooperman. This has examination, where a small capsule with a camera, recording chip, transmitter and battery of all record information while the camera passes through the intestines. I got a six hour video to review. Specifically, I was looking for other areas of ischemia (lack of blood flow) and to make sure that there are no other lesions that could be causing partial obstructions of

8

Dr. Cooperman's bowel. These would include large polyps, benign or malignant tumors, and naturally there are many other causes. It was, essentially, a normal examination.

As mentioned, I have suggested Dr. Cooperman stay on medication he obtains from outside of the US as well as Nexium and, at times, Carafate for his severe and refractory reflux. In addition, I will need to continue to monitor, possible ongoing inflammation, irritation and potential scarring and/or formation of Barrett's esophagus (considered to be a premalignant condition). Naturally this will require multiple visits during the course of the year, both office visits and procedural. Given the ischemic colitis he will also need follow-ups of his colon. I am not certain yet why the ischemia occurred and in fact we will be monitoring and reevaluating the various causes over the course of the next several months (he did have an MRI, which revealed only mild narrowing of the celiac axis, this is, however, not consistent with his severe vascular disease).

Dr. Cooperman runs a significant risk of developing ulcerations in his esophagus or the precancerous condition mentioned (not to mention scarring of his esophagus) if he does not take the medications as noted above or follow through with visits and procedures as of outlined.

9

He has limited on diet, in that, he must have very frequent very small low-fat meals.  In addition, activities restricted given the recent bout of ischemic colitis and a possible "low-flow" state.

While I cannot comment on prison life, given Dr. Cooperman's overall condition, I am very concerned that appropriate management, care, follow-up and prompt diagnosis of new problems arising from old, will be affected.  Naturally if he is frequently and carefully monitored while in prison with blood tests, dietary review, and other appropriate studies as needed (as well as seeing his various physicians on a fairly frequent basis), his overall health should not deteriorate or worsen significantly.

While it is very hard to ascertain the exact role of stress, there is no question that it plays a role in gastrointestinal motility, contractions of the stomach, which he lacks, and vascular disease, which I am quite certain is the cause of his ischemic colitis.  While there is no direct treatment for this, I have recommended to Dr. Cooperman that to the extent that he can he should lower all stress levels.  I am a bit concerned about starting antidepressants because of potential side effects with medications he is already on.

With respect to prognosis, my hope is that Dr. Cooperman's condition does not worsen.  Clearly it will not improve as it has been longstanding and well

10

documented.  The natural history for vascular disease is, in fact, to worsen. Ischemic colitis can result in removal of the colon as mentioned, unfortunately there is also risk of continued bleeding and perforation of the colon, which naturally are emergencies.  While not common, they can occur.

As his gastroparesis is so severe, I don't believe it will get worse than it already is.  Ultimately the reflux, which is a result of the gastroparesis, could result in Barrett's esophagus, as I had mentioned above, and this of course needs to be very carefully monitored, also as I have outlined

I have tried to sum up Dr. Cooperman's medical problems, I would be happy to forward any and all tests but I believe I have summarized them in this note.

**3.      Tinnitus**

Mr. Cooperman also has diminished hearing in both ears, and severe tinnitus.  This causes a constant and occasionally quite loud buzzing in his ears, as well as further diminished hearing.  He has had surgery twice to no avail and was diagnosed with otoscleroisis, a disease of the bones of the inner ear.

*               *               *

It seems beyond question that Mr. Cooperman's myriad medical conditions are serious and debilitating. He can't exercise or even walk long distances (like in an airport) without chest pain.  He can't eat without nausea, recurrent vomiting, abdominal pain, and pressure in the upper abdomen because his stomach does not properly empty.  Recently he couldn't move his bowels due to lack of blood flow. His hearing is diminished but he can't stop hearing a buzzing sound in his ears. He

PRESENTENCE MEMORANDUM SUBMITTED ON BEHALF OF STEVEN COOPERMAN

has ulcers in his esophagus and colon.  He requires constant medication and attention to lessen his symptoms and lives with the risk of "heart attacks, admissions for chest pain, and death" (Charney Report), "potential scarring and/or formation of Barrett's esophagus (considered to be a premalignant condition)" and a "worsening of his Ischemic colitis which can result in removal of the colon ... [or] continued bleeding and perforation of the colon, which naturally are emergencies" (Gardner Report).

Surely, a prison sentence would pose a great risk to his health and would undoubtedly impose massive costs upon the prison system.  For this reason alone, a reasonable sentence would be one which allows Mr. Cooperman to receive the medical care he needs without unduly burdening the Bureau of Prisons and without creating a risk of serious injury or even death.

## B.   Mr. Cooperman's History with this Investigation

In the summer of 1999, Mr. Cooperman was convicted after trial of various counts relating to his participation in a scheme to defraud based upon a false claim of the theft of paintings from his home.  Within a few months of the conviction, Mr. Cooperman, through his attorney, disclosed to the Government the Milberg Weiss obstruction of justice conspiracy and his participation in it.  At the time, there was no investigation of Milberg Weiss as the Government was totally unaware of this massive conspiracy.  Over the next two years while awaiting sentence, Mr. Cooperman cooperated in what was just the beginning of the Government's investigation by producing and reviewing numerous documents, engaging in numerous debriefing sessions, making many surreptitious telephone and body wire recordings and identifying numerous potential co-conspirators and corroborating witnesses.

Approximately one year after Mr. Cooperman began cooperating without the benefit of any cooperation agreement, the Government and Mr. Cooperman

entered into a case disposition agreement, whereupon the Government agreed to recommend a reduction of sentence in exchange for Mr. Cooperman's continued truthful and complete cooperation, and also agreed to grant Mr. Cooperman immunity for his participation in the Milberg Weiss conspiracy, which participation he had disclosed in full to them.  Mr. Cooperman was sentenced a little more than a year later and received a sentence reduction of six levels based on defendant's substantial assistance and one level for the defendant's extraordinary charitable contributions.  His guideline range was lowered from 78 to 97 months to 37 to 46 months, and he was sentenced to 37 months.

At that point, subpoenas for records had not even gone out and it was unclear whether anyone would ever be indicted.

After Mr. Cooperman's sentence, he surrendered and began serving his sentence at Devans Correctional Facility in Massachusetts.  However, the Government sent out a very large number of subpoenas and accumulated hundreds of boxes of documents relating to the investigation.  The Government needed Mr. Cooperman's continued cooperation to review these hundreds of thousands of documents which related to cases in which he or others served as plaintiffs in order to assist their investigation and give the best of his knowledge and information concerning the case.

This required the Bureau of Prisons to move Mr. Cooperman from Devans out west to be housed in the local federal jail.  He stayed out west for approximately one year, residing in either MDC or Kern County Correctional Facility while he engaged in an unprecedented level of intensive cooperation in this investigation.  Attached hereto as Exhibit C is the Government's Supplemental MPA re: Rule 35 motion, which briefly outlines his extraordinary efforts in this regard.

We believe that this lengthy period of cooperation under extremely onerous and severe conditions of incarceration contributed greatly to the lapse in judgment which led to his violation of the case disposition agreement.  His inexplicable, sporadic and illogical conduct occurred during this period of time when he was under great physical and emotional trauma and strain because of the conditions of his incarceration and also because of his ex-wife's decision to sue him for divorce without so much as a warning while he was on the other side of the United States.

A brief recitation of this period of Mr. Cooperman's life will illustrate the conditions under which Mr. Cooperman made this serious error of judgment which violated his case disposition agreement.

Mr. Cooperman left Devens on December 15, 2001. He was in solitary confinement for 23 days, not as a result of any infraction he committed, but strictly as a result of the move, when segregation is standard, or for his own protection because of rumors of cooperation.  These 23 days do not include the hundreds of additional hours, as will be explained below, which he spent in segregation simply to get to and from MDC or Kern County on the more than 70 occasions that he was brought to the United States Attorney's office for debriefing sessions.

On each of those 70-plus days, he spent an average of eight hours in holding cells. When he was brought form Kern County, he was awakened at 1:00 a.m. and placed in a holding cell or on a bus from 2-9 AM.  On the return he was in a holding cell or on the bus from approximately from 5-10 PM.  At MDC, he was in a holding cell from approximately 5-9 AM and on his return from about 5-9 PM.  During this period he had no activities and absolutely nothing to do except sit and wait with other inmates.  At 8 hours per day, this amounts to approximately 480 hours or 20 days in holding cells.

For 62 days he was housed at Kern County Detention Facility.  This is a substandard, non-federally run jail, which essentially houses INS detainees and

PRESENTENCE MEMORANDUM SUBMITTED ON BEHALF OF STEVEN COOPERMAN

many inmates with gang affiliations. (Inmates were given red wrist bands to signify them as violent.) The conditions of his incarceration at Kern County were very onerous and quite dangerous.  On several occasions there were fights in his unit and Mr. Cooperman was often fearful for his physical safety. The conditions at this facility are radically inferior to any Federal prison. He essentially was housed in a large room with approximately thirty inmates, 3 tiers to a bunk, no walls even around toilets or showers, with a few tables and chairs bolted to the floor in the middle of the room.  These conditions were exacerbated by the torturous conditions required to transport Mr. Cooperman from Kern to the U.S. Attorney's Office, which includes at least four hours in holding cells, six hours on the bus and a total commitment of approximately 20 hours just to spend seven at the United States Attorney's office.  Mr. Cooperman made this trip numerous times from Kern County. The situation was so onerous that the Government and defense counsel jointly moved for an order prohibiting his continued housing at Kern County.

On many days, he did not receive the medication prescribed for him which he had been taking for several years for gastroparesis.  This resulted in virtually constant nausea to some degree and often indigestion and vomiting.

Likewise, there were many days during which he had no access to a telephone and could not speak to his family.

After he left Devens, Mr. Cooperman did not see his wife or eleven-year old son Jonathan until June 12th, a period of over six months.  He did not see his family at all for the holiday season, and for most of it was unable even to telephone them because he was in "solitary" at MDC and was not allowed to make telephone calls. This was particularly painful as Jonathan and his father were uncommonly close as numerous letters attached as part of Exhibit D demonstrate.

Yet, the gravest emotional blow came when he was notified of his wife's suit for a divorce, as a result of being served with the complaint while he was sitting in MDC. He had no hint it was even contemplated. He was quite literally devastated. At one point he simply cried for nearly an hour while sitting in a room of Milberg Weiss documents at the prosecutor's office. This was in stark contrast to his usual stoic demeanor. Yet he never asked to be sent back East, preferring to continue his cooperation as needed.

Likewise, Mr. Cooperman's physical health deteriorated drastically during this period. As the Government wrote in their Supplemental MPA re: Rule 35 motion (Exhibit C, pps.13-14):

> Defendant commenced serving his custodial sentence at the Federal Medical Center at Devens, Massachusetts, due to his already poor health. Since his transfer to Los Angeles, to better provide cooperation, the government has observed that defendant=s health has significantly deteriorated. His hearing has become increasingly impaired, making it more difficult for him to communicate. He has difficulty eating, apparently due to gastrointestinal problems, and has lost a substantial amount of weight. Given the obvious decline in defendant=s physical condition over this past year, his consistently focused and productive efforts in debriefings and document review sessions, over the course of many months, are particularly impressive. Moreover, defendant could have requested return to FMC Devins long ago, to better address his health issues, and the government would not have objected. Instead, defendant

16

has been willing to continue his custody in Los Angeles,

at MDC, as long as the government felt his presence here

would facilitate his cooperation.

Since 1996, he had been on a medication to manage his gastroparesis called Propulsid.  Approximately two years before his incarceration, Propulsid was taken off the market because it caused heart problems.  However Mr. Cooperman received a special approval from the FDA to receive the drug since he never experienced any adverse reaction to it and had a great need for the drug. In prison, Mr. Cooperman could not receive the drug because it was "experimental" which exacerbated his gastroparesis. (This might well happen again if Mr. Cooperman is incarcerated as he is now taking a Canadian medication not readily available in the U.S.).

As was witnessed during one of Mr. Cooperman's debriefing sessions, Mr. Cooperman suffered a severe attack of pain in his abdomen in late February. There was a quite obvious bulge in his abdomen which was definitely a hernia in need of repair. The surgery awaited his release from prison, months later.

He even suffered a fall while riding on the bus from Kern in late April, and developed a large hematoma on his right leg. He suffered pain and had obvious swelling from the knee down on the right side. (He has since been advised to have knee surgery by doctors at Cornell University Medical Center to lessen the pain and perform structural repair).

It was during this period of time that Mr. Cooperman improperly signed his physician's name to some of the monthly disability forms that needed to be submitted to his disability insurance companies.  He did not do this every time; rather it was wholly sporadic.  In some months, he mailed the forms to his doctor, who readily filled them out and sent them in, as he had done for the past 13 years. However, in others, he took an ill advised and wholly inappropriate "shortcut" and

17

signed them himself.  Cruelly, this came to light when his wife, who was the recipient of all of this disability money while Mr. Cooperman was in prison, disclosed this during an acrimonious divorce for the purpose of trying to extort an unfair settlement from Mr. Cooperman. At the conclusion of the ensuing Government investigation, Mr. Cooperman admitted his conduct and agreed to plead guilty to his role in the Milberg Weiss conspiracy. He never lied about his conduct, either in his divorce or to the prosecution.

While this conduct was undoubtedly improper and unacceptable, there is no dispute that there was no intent to defraud and indeed no loss of any kind.  He was disabled as has been verified by the insurance companies who continue to pay him even after being fully advised of his conduct, and in some cases, even after temporarily halting payment during the conduct of their own investigation.

Even after this conduct was known to the U.S. Attorney's Office, Mr. Cooperman continued to cooperate and hold himself ready for the grand jury and/or trial testimony. Since his plea of guilty he has reviewed documents at the Government's request and held himself at the ready to return to California if needed.

While this conduct breached his plea agreement, it is important to note that at no time did Mr. Cooperman ever lie, fabricate or even shade his testimony during his cooperation.  As the Government wrote at the time of its Rule 35 motion, (which resulted in a reduction of his sentence from 37 months to 24 months, six months more than the 18 months the Government recommended). "Defendant was fully cooperative and willing to cover any area relevant to the investigation.  He was candid and did not appear to minimize his own conduct or try to exaggerate the conduct of others."  Supplemental MPA re: Rule 35 motion (Exhibit C, pg.12). To this day, defendant's cooperation has always been complete and truthful. Its value needs no elucidation.

4. **Personal History**

Attached hereto as Exhibits D and E are the complete Presentence Memorandum and accompanying exhibits submitted in connection with Mr. Cooperman's sentencing in July 2001.  His personal history and indeed his family and civic relationships up to that point in time are fully set forth in those documents and will not be repeated here.

We would like to set forth below, however, a few excerpts from the myriad letters from his colleagues and patients, who vividly attest to his compassion and generosity which was spontaneous, ongoing and flowed purely out of the goodness of his heart.  The attached exhibits also include numerous other acts of personal and civic kindness and charity, which will not be repeated here.  We beseech the Court to review those voluminous documents, so that it can obtain a rounded view of the man who stands before the Court for sentencing.

Until 1989, Mr. Cooperman was a successful eye surgeon, practicing in Los Angeles.  Many of his patients were elderly and infirm, and many had been told by other doctors that they could not be helped.  As letters from these citizens, many of whom were shortchanged by the medical community, demonstrate, Mr. Cooperman made them feel important and gave them a degree of care to which they were wholly unaccustomed.  Most importantly is that he often did it for free.

The breadth of his charitable work has been described by the anesthesiologist who worked with Mr. Cooperman during this period, Dr. Nader Nwaisser:

> From 1982 through 1989, I worked with Dr.
> Cooperman regularly as his primary Anesthesiologist.
> During this period of time, we performed eye surgeries
> on at least 5000 patients.  Dr. Cooperman was known as
> an excellent, competent surgeon.  There were many,

many patients who credit Dr. Cooperman with giving
them back their eyesight.

Dr. Cooperman was very generous and
compassionate as a doctor.  **He would not turn away
patients (mostly seniors) who didn't have insurance
and couldn't afford to pay.  I remember that he would
simply put them in the surgery schedule and write
"charity" after their name.  I knew from the chart
that we would not get paid for that case but we would
still perform the surgery.  He would also convince the
hospital not to charge them.  For many years, we
would have one or two patients a week that we would
treat for free.  In my experience, other doctors did not
do this.  In 25 years of practicing medicine, I might
have seen 5 or 6 charity cases with other doctors.
That is all.  With Dr. Cooperman, it was incorporated
into his weekly practice.**

I also recall the wonderful rapport Dr. Cooperman
had with his patients and they really loved him.  He
would typically perform surgery on one eye at a time,
about a week or a month apart.  When a patient returned
for the second surgery, they would be so happy and
grateful to Dr. Cooperman because they could see again.

Working with him for so long, I knew first hand
the kind of attention he gave his patients and the results
he achieved.  I even sent him patients that I knew as
friends.  One of them had serious health problems and

20

couldn't see at all.  Dr. Cooperman was able to restore

his eyesight and every time I saw the gentleman

afterwards, he would say, "Thank you for sending me to

Dr. Cooperman". (Emphasis added).

[Exhibit L to the Presentence Memorandum (Exhibit D hereto)].

Jodi Martin, Mr. Cooperman's office manager, also described his attention to his patients and commitment to charitable care:

I met Dr. Cooperman in 1985 when I was hired to

work as a billing clerk in his ophthalmology practice in

Beverly Hills.  I worked for him until he retired in 1989

at which time I was his office manager.  Our relationship

developed into a friendship and we have continued to

keep in touch, even after he and his family moved to

Connecticut.

During the time I was with Dr. Cooperman in his

practice, I learned what a caring, compassionate and

giving man he is.  His specialty was cataract surgery,

therefore most of his patients were senior citizens.  He

was always patient and kind to them.  His patients loved

him.  They often told us how much they appreciated his

spending time with them and listening to their concerns.

Mr. Cooperman often reduced fees, or even waived fees

for patient who were unable to pay for their treatment.

He provided transportation (at his own expense) to many,

many patients who were unable to get to the office on

their own.  On several occasions, Dr. Cooperman actually

paid the hospital fees and medical supply fees himself for

21

patients who would have otherwise been unable to have
sight saving surgery.

Dr. Cooperman provided many community
services as well.  He did lectures and eye screenings at
Senior Centers and Health Fairs at no cost.  He also
funded special events such as Christmas carolers and
Hawaiian Luaus at the Senior Centers.  He also published
a Senior Newsletter.  Dr. Cooperman was not only good
to his patients he was good to his employees.  I have
never worked for a better man.  I often joke with my
husband and tell him it's a good thing Dr. Cooperman
retired or I wouldn't have been able move out of town
and marry him.  That's how great my loyalty [sic] to Dr.
Cooperman."

Mr. Cooperman's attention and care for all of his patients, whether charity or
otherwise, is graphically demonstrated by even a few quotations from the many
letters attached to Exhibit E (Patient Letter Appendix).  For example:

I want to thank you for accepting Medicare so I
was able to have my eye implants.  I had one done six
days ago and now I'm having the second operation a
week later.  I had cataract surgery done ten years ago.  **I
have been waiting ten years to have eye implants**.

You and your staff have a well-organized system.
They were very courteous and efficient.  I also want to
thank you for the transportation of picking me up and
returning me home the day of surgery.  (Emphasis added)

William Sasner, March 8, 1987 (Patient Letter Appendix, Exhibit 1).

...believe me it is pretty wonderful to have the one doctor
in the state who not only cares about people but who is so
willing to help them and believe me you are so badly
needed. It is also pretty special the way you make every
patient feel that he or she is very important to you
because you let us keep our dignity and pride in
ourselves.

Margarite Logan (Patient Letter Appendix, Exhibit 3).

When I got home late this evening, I sat down to read my
correspondence and after about two hours of this and
other work, I realized that I was actually crying! When I
stopped to analyze what was going on, I realized that I
was able to read (my favorite occupation) without any
difficulty, as a matter of fact with ease, relaxed and not
tired from the effort. This last year and a half was pure
hell for me. I just didn't realize how difficult it had been.
My tears were tears of joy and I felt that I had to share
them with you.

Michael Kimmel, September 10, 1986 (Patient Letter Appendix, Exhibit 4).

Just a brief note to express my gratitude for the
wonderful care you have given me and a short progress
report. . . . I am now symptom free, off ophthalmic
medications, have had my drivers license renewed for
another four years and only wish to God I had gone to
you in the first place!

In closing I would like to thank you also for your
kindness, your consideration for one's economic welfare

23

and for the wonderful skills that you offer, accordingly, to so many.  You are a true credit to the profession of medicine.

Ray McHugh, January 5, 1987 (Patient Letter Appendix, Exhibit 5).

I think all of your patients would join me in saying you are not just a superb opthamologist but such a kind, caring, compassionate human being.

Sybil Aznauer (Patient Letter Appendix, Exhibit 7).

For fifteen years you took good care of both of us, and became our friend. I want to express my gratitude for everything you have done for us.

Rosa Brown (Patient Letter Appendix, Exhibit 8).

... In the past fifteen years I have been to many ophthalmologists recommended to me by co-workers. **"Nothing can be done"! was the one theme they all sang.** I gave up being able to see with that right eye. Then I got lucky.  I met you. You said, "Let's get the cataract off first, and then we'll see what can be done." Well, that did it! That eye is now terrific. Subsequently, you removed the cataract from the left eye and all I can now say is Steven Cooperman I am glad I met ya!" (Emphasis added)

Marion Finley, February 6, 1987 (Patient Letter Appendix, Exhibit 9)

I have suffered no pain and most of all I see. On Wednesday I was in surgery, on Friday I was driving my car. I feel I want to help everyone who has cataracts who is afraid, God has given Dr. Cooperman the knowledge to

help and I'll tell everyone I know and will continue to tell
them not to go around stumbling, go to Dr. Coopermans,
**as a senior citizen you will be treated like you are**
**somebody**. (Emphasis added)

Leonora Torres Cannon (Patient Letter Appendix, Exhibit 10).

"Kris Kringle of Beverly Hills" is a familiar title
for you among my friends up here in the country.  They
remember when my blindness made it impossible for me
to work at my reporting job, play bridge or even to drive
a car.  When someone took me shopping, I could not read
the prices.  I had to spend a summer without stars, only a
vague distorted moon.  As my lovely books and camera
gathered dust, so did my spirit. But You turned my life
around by an unheard of "insurance only" payment plan
which enabled me to restore myself back into the world.

Jane Sarber (Patient Letter Appendix, Exhibit 13).

I am taken to the Hollywood Eye Hospital. My
clothing becomes a bed gown.  I am given a complete
physical, X-rays, EKG test, ten body hookups
electronically monitored.  I am no longer "just an
number", I am now an individual, compassionately cared
for.  I am in loving hands.  I am at "peace".  I am back
home the same day.  To have had that "one-time-
relationship", with a love that transcends words, I say,
"Thank you Steven G. Cooperman".

P.S. April 6 already the day is brighter. My vision
improves daily."

25

Don Milbright, April 4, 1987 (Patient Letter Appendix, Exhibit 42).

> After diagnosis by several eye doctors I was told I had cataracts on both eyes.  I became discouraged after many delays between appointments and nothing being done.
>
> **One of the doctors to whom I was referred required $6000.00 in advance for each eye operation. This came as a shock as I live on a fixed income.**
>
> **Then in August 1986 I heard about a doctor with years of successful experience who would remove my cataracts without hospitalization and no additional cost above Medicare.**  I made an appointment and three days later Dr. Steven Cooperman removed the cataract on my right eye.  On February 4, 1987 he removed the cataract from my left eye.
>
> **You and your staff could not have given me better treatment if I had been a millionaire.**  From the beginning I felt at ease and assured of Dr. Cooperman's competence.
>
> You have helped so many people and I am one who was legally blind when I met you and I want you to know that you have reaffirmed my life and I hope God lets you be with us for many years (Emphasis added).

Francis W. Taft (Patient Letter Appendix, Exhibit 19)

The numerous letters submitted as part of Exhibit E attest as well to Mr. Cooperman's various charitable endeavours throughout his life.  The portrait that emerges of Mr. Cooperman surely proves the adage that it is difficult to take the

measure of a man.  Obviously, he transgressed the rules of society, yet, at the same time, he enhanced the lives of so many in a manner far beyond the call of duty.

Since his release from incarceration, he has remarried and become an integral part of a new family, as well as the bedrock for his son, Jonathan.  As the attached letters document, his compassion and caring for those around him has not changed.

A letter from his wife, Robbie Bensley Cooperman best describes who Mr. Cooperman is at the present and what he has meant to her and her family in the three years she has known him.  For the Court's convenience, it is excerpted in its entirety herein (Exhibit F):

> I write on behalf of my husband Steven Cooperman.  This is a difficult letter for me to write. How can I adequately convey the fear engendered by this situation?  How can I convey the love and respect I have for this man even while knowing that he has made some serious errors in judgment.  What words can I use that will reach your heart?  All I can do in this letter is describe the man who is my love and my life and hope that you will in your wisdom find that he merits your consideration and mercy.
>
> I met Steve in 2005 and we fell in love almost immediately.  He quickly told me about his past because he didn't want to mislead me in any way.  I looked beyond the history and found a future with a man who is kind, generous, and loving.  My children were concerned for me because I had been in a second marriage with a person who was emotionally abusive.  However, they

came to know, love and respect Steve and together we have forged a wonderful family.

I am the only daughter of holocaust survivors and was born in Germany after the war.  My parents are now both gone and so along with my children, grandchildren and one elderly uncle (he is the only family member that survived) Steve is my family.

My mother, who suffered from severe chronic asthma, spent her summers with me and her winters in Miami.  When it came time for her to go down for the winter Steve came with us to help in any way that he could.  A few months later she fractured a vertebra and this vital woman who was my mentor and my hero became totally incapacitated physically and mentally.  I dealt not only with her physical deterioration, but had to deal with her dementia.  Every day presented another difficulty, every day presented another challenge, and every day Steve was there to lend me his support and his strength.  I tried to bring her back to New York, but could not as she was not physically able to make the trip, even in an ambulance.  And so, I flew to Miami every week (I was working and could not threaten my source of income).  There was one weekend when I was unable to get a plane reservation and did not know how I would make it to Florida.  It was vitally important that I be there regularly so that I could make sure that she was getting

the care she needed.  Steve drove 22 hours with me so that I could be there.

We married in 2006, and shortly after our marriage my Mom passed away and Steve was a source of strength yet again for me and for my children.  Shortly after my mother died, we found out that Steve's immunity in the Milberg Weiss trial was to be rescinded.  And the stress became unbearable.  Steve's health began to deteriorate. One day while he waited for me to finish a transaction in relation to my Mom's estate, he suffered severe chest pains.  He did not want to worry me but I saw his distress and forced him to call the doctor who immediately scheduled an angiogram.  He had suffered a heart attack years before which blocked his main artery on one side, and now had 95% blockage on the other side.  The doctor put in 3 stents and he is under the constant care of a cardiologist.

He had suffered a deterioration of his hearing while in prison and after this whole process began this condition worsened, again exacerbated by severe stress. While he wears hearing aids now he still has difficulty hearing.   He also has severe gastrointestinal problems, which have worsened in the past two years.  In July, the pain became so acute we went to the emergency room and he spent five days in the hospital with ischemia, again aggravated by extreme stress.  My husband is not a well man.

29

I could go on and on about what a good man this is.  Indeed, he told me about his past and I told him about having had two bouts with breast cancer and that I had had a mastectomy.  Many men would have been put off, instead he made me feel beautiful and feminine.  I told him that I was an observant Jew and had a totally different life style and instead of asking that I change my life he respected my beliefs and the very different structure that I adhered to.

Steve's son Jonathan has spent most of the last two years in our home.  He adores his father and needs him.  He is a young man whose life was badly ripped apart.  He has described to me how he felt when his father left for prison when he was 11—his devastation and confusion.  The world as he knew it fell apart.  Steve has worked so very hard to rebuild that world that was taken from his son and now it is once again threatened not only by prison but also by the possibility that Steve might not survive another incarceration.

I have yet to see a more devoted father, grandfather, husband and friend.  We all need him and love him.  But we fear for him.  His health is at risk, his life is at risk.  Yes, he has made mistakes but I ask for your compassion.

Thank you for your consideration.

The letter of Robbie's son, Adam Bensley, demonstrates the impact a good person can have in a short time on a family in turmoil (Exhibit G):

My mother began dating Steve in 2005, several years after having left a disastrous marriage that left her incredibly disillusioned to the prospect of finding someone to spend the remainder of her life with.  She was living alone and as a only child caring solely for my grandmother who was in failing health.  To say that Steve lifted certain clouds that hung over her head would be an understatement.  They quickly developed a bond with each other that soon developed into a mutual dependence and happiness that I had feared my mother had given up on finding.

The truth is that my mother couldn't have found Steve soon enough.  My grandmother, who for years battled the debilitating effects of asthma, was finally succumbing to the tolls her medication was taking on her body.  I remember sitting at her dining table in Florida in January of 2007.  She never let on that night as to just how much pain she was in, but when the medics took her to the hospital late that evening, she left her home for the last time.  The following eight months, while my grandmother slowly declined in a hospital until her death, were by far the toughest of my mother's life.  Steve, a man my mother had known for only a couple of months but in that time had already developed a relationship that people make movies about, walked with her for every step.  Often accompanying my mother to Florida for a weekend or even a day, a trip that was taken each week

31

by my Mom, Steve provided the support that no human being should be without when going through the long painful process of losing a parent.  That he did this so quickly after meeting my  mother quickly showed me the depth of his love and compassion for his family.

Steve is a man that understands life is based on the relationships you create and that creating relationships is based on what you invest.  Steve quickly became someone that I considered part of my family, not because of the fact that he married my mother but because of things he did for me and because of things I find myself wanting to do for him in response.  Life thankfully isn't made of situations that are as dramatic as the one I previously detailed.  They are made up of situations that don't require assistance or someone to talk to, but moments that nonetheless make you appreciate when someone is there.  Like the time I went to the emergency room late at night for a minor household injury and Steve drove down to sit with me in the hospital.  There was the time right before my daughter's 1st birthday party was going to start that my mom realized she forgot the cake on her kitchen counter.  Steve, who had just arrived, quickly volunteered to drive another hour and a half back to his house to pick up the cake.  There is the fact that Steve converted his home to accord to the laws of kosher to accommodate my mother, who is an observant orthodox Jew…

32

I cannot presume to understand the facts of the
case that is before your Honor.  The details of this story
took place in a time of Steve's life well before he came
into my mother's and subsequently mine and it's not
something that Steve speaks about with me often.  I'll ask
your Honor's indulgence if I speculate that part of the
reason that Steve doesn't talk too much about his past,
about mistakes that occurred prior to his previously
served prison sentence, is that his focus is now on
making up for lost time.  It is a focus trained on nurturing
his relationships with my mom and between them their
five children and eight grandchildren.

Certainly there is a selfish aspect to this letter as
well.  I don't want my mom to be alone again at this
stage in her life.  I don't want my mom to lose someone
for an extended period of time who she loves so much
and who has shown such a devotion both to her and to
her family.  I request, that with your Honor's leniency,
this will not be the case.

Mr. Cooperman's magnanimity extends beyond his immediate family.  Rose
Gerszberg, a friend of Robbie Bensley writes (Exhibit H):

Aside from the fact that Steve has always been
warm, approachable and happy to accommodate the
strong friendship that Robbie and I share, he has been a
wonderful advocate for me on his own.  I was diagnosed
with breast cancer last year and was wading through
medical visits and medical advice as a single woman.  At

that time, I had not even told my children about the
diagnosis, still gathering information and trying to
process.  But Steve insisted on accompanying me to the
doctor so that he could be a second set of ears, advise me,
and help me to navigate with enough understanding to be
able to decide on a course of treatment.

It was during this time that I realized how well-
versed Steve is as a physician and how empathetic he is
as a human being.  He was a strong source of support to
me during that time, and has been so for Robbie since
they met four years ago.

In all the years I have known Robbie – and we
have shared some difficult years – I have never seen her
happier or more at peace than she has been since Steve
came into her life.  Notwithstanding differences in
religious observance, Steve supports Robbie in all areas
of personal expression and offers a safe haven without
challenge or judgment.

The letter of Rachel Waldman also speaks to the impression Mr. Cooperman
has made on her and her family (Exhibit I):

My husband and I met Steve three years ago.
Being a protective daughter I had concerns about their
relationship at the beginning.  However, as I got to know
Steve I have come to realize he is one of the most
compassionate and generous men I have ever met.  He is
a loving, caring husband and my mother is truly happy
again after many years of hardships.

34

This past May, on mother's day no less, my mother suffered from a dangerous fall that almost cost her eyesight and kept her confined to a hospital bed for five days.  My brother Adam and I honestly do not know what we would have done had Steve not been there day and night.  He was the rock and support that we all so desperately needed.

He has become an integral part of our family.  The patience and love he shows to my two children ages 5 and 2 have earned him a place in all of our hearts. Whenever my mother walks through my front door they both immediately ask where Steve is if he is not with her. He has truly become an important part of their lives. These two children though not related by birth have come to see Steve as a Grandfather figure.  They love and need their Steve.

My husband Marc and I have come to know this man as a generous husband, father and grandfather who is always there to help us in any way.  But, we also know that he is not well and we are gravely concerned about his health.  In the past two years I have watched as his stamina even in simple every day activities has been diminished.  As the stress has increased our concern for his welfare has increased as well.

The letter of Jack Goehring also speaks to Mr. Cooperman's desire to help his friends in any way that he can, as well as to his obviously deteriorating physical condition (Exhibit J):

PRESENTENCE MEMORANDUM SUBMITTED ON BEHALF OF STEVEN COOPERMAN

Steve is an enormously generous person.  He uses his talent, time and resources to do so much good for so many people.  He has always been inclined to help others.  Briefly I'd like to relay a personal story about how he saved our family financially.  My wife and I were half owners of a 3-unit apartment building and had been making mortgage payments on its for approximately 30 years.  It turned out we didn't own it after all due to a massive fraud by our other partner.  This was devastating to us.  We had been to four senior lawyers to try to reclaim our interest, but we were told the process would be lengthy and costly, with no guarantee of a favourable outcome.  When Steve heard about this, he drove down from Connecticut to spend some time with us.  After a long discussion, he asked if he could help.  He thought he could get the building back.  Your Honor, within six days, he did get the building back for us, free and clear, with no mortgage.  We now own the entire building.  The partner who defrauded us is no longer a partner.  Steve saw our complete savings/retirement going down the drain and sank all his energy into finding a solution.  We are forever grateful.

A month ago, we stopped by his home in Connecticut for a quick overnight while taking our son on a college tour, and we were aghast at Steve's appearance – pale, wobbly and rather rambling in his thoughts.  We believe the fear of serving time in prison

PRESENTENCE MEMORANDUM SUBMITTED ON BEHALF OF STEVEN COOPERMAN

had a stranglehold on him.  His lovely wife, who has had
breast cancer and cancer surgery with chemotherapy, has
been his rock since he was released from jail.  She too
was visibly shaken.  He had just come home from the
hospital after a serious gastro-intestinal episode, and we
can only think that his poor health these days is due to
the unbelievable stress he is under as he awaits his
sentencing.

Finally, Mr. Cooperman's son, Jonathan, who is just starting college, has
written to the Court.  He writes (Exhibit K):

Before my dad went to prison I was a straight A
student.  While he was gone, I turned into a straight D
student.  Knowing he was in such a horrible (sic)
constantly ate away at me.  It was all I ever thought about
and I don't want to have to live through that again and I
am afraid that he cannot live through that again.

I have just started my freshman year at
Jacksonville University and after all these years I am
finally starting to get my life back on track.  More so than
anything this is because my dad has been here to help and
support me.

The saddest moment of my life is the morning my
dad had to leave.  His lawyer came to our house to pick
him up and watching him get into the car with his lawyer
and seeing his face as the two of them drove away killed
me.  My dad tried so hard to smile at me as he left,
because he knew that seeing him look upset would make

37

it harder for me.  I love my dad and if I could ask for
only one thing as long as I live it would be for my dad to
live at home and not be taken away from me.

Your Honor, I am afraid that if he is sent to prison
with the terrible state of his health he will not live to
come back to me.  I am begging you, please don't make
me relive that moment in my life, that to this day makes
me cry when I think about it.  Please don't send my dad
back to prison.  I am enclosing a copy of an essay I wrote
for my college applications which will explain further
how I feel about my dad and how important he is to me.
Please, please read it.

Thank you for taking the time to read my letter.

See also the letters from Mr. Cooperman's daughters Jackie Isles and Kelly
Rogoff, which are attached, along with other letters on his behalf, collectively as
Exhibit L.

## C.   **Conclusion**

In this most bizarre and unique set of circumstances, the Court has the
difficult task of balancing all of the various factors set forth in 18 U.S.C. §3553(a)
in its effort to impose a sentence "sufficient, but not greater than necessary" to
meet the goals of sentencing set forth therein.  In the many prior sentencings in his

///

///

38

very case, the Court has exercised great care to render an appropriate sentence. We respectfully request that the Court consider the myriad, peculiar facts and circumstances of this case and determine whether there is any need for further incarceration for Mr. Cooperman.

Dated: October 28, 2008                    Respectfully submitted,

                                           RUSSELL GIOIELLA
                                           LITMAN, ASCHE & GIOIELLA LLP


                                             /s/ Russell M. Gioiella
                                           By: RUSSELL M. GIOIELLA
                                           Attorneys for Defendant
                                           Steven G. Cooperman, M.D.

DATED: October 28, 2008                    JOHN S. CROUCHLEY
                                           CROWELL & MORING LLP


                                             /s/ John S. Crouchley
                                           By: JOHN S. CROUCHLEY
                                           Local Counsel for Defendant
                                           Steven G. Cooperman, M.D.

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, at Crowell & Moring LLP at 800 Wilshire Boulevard, Suite 500, Los Angeles, California 90017.  I am over the age of 18 and not a party to the within action.

On **October 28, 2008**, I served the foregoing document described as **PRESENTENCE MEMORANDUM SUBMITTED ON BEHALF OF STEVEN COOPERMAN** on the parties in this action by placing the true copies thereof enclosed in a sealed envelope addressed as follows:

**PLEASE SEE ATTACHED SERVICE LIST.**

**[X]    BY MAIL**:  I caused such envelopes with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing deposited with the United States Postal Service that same day in the ordinary course of business.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **October 28, 2008**, at Los Angeles, California.


        /s/  Kristen Savage Garcia
        KRISTEN SAVAGE GARCIA

1

**<u>SERVICE LIST</u>**

2

Douglas A. Axel

3

United States Attorney's Office
312 North Spring Street

4

Los Angeles, California  90012

5

6

Richard Robinson
United States Attorney's Office

7

312 North Spring Street
Los Angeles, California  90012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28