Several years ago Steve took on the leadership of the school's Cub Scout troop. The troop was in danger of being disbanded until Steve stepped in to help out. For two years he led the group of over 40 boys in all of their Scout activities. We have never had a more successful Scout leader.

Steve and his son Jonathan were both involved in a major fundraising project that the school sponsored for the Muscular Dystrophy Association. Jonathan was very enthusiastic about the "jumpathon". His example and hard work motivated other students. Steve Cooperman worked very closely with the representatives from MDA and with the staff of our school to coordinate the event. It was record-breaking in both the dollars raised from pledges and in participation.
It was through his involvement as a parent and Scout leader that Steve came to the attention of the nominating committee of our Board of Trustees. Steve was elected to our Board and served for three years. During his tenure on the Board he was an important member of the development and marketing committees. The marketing committee adopted many of his suggestions concerning publications and advertising. Steve has also been a generous contributor to the school, supporting our capital campaign and our music program.

Rev. David Johnson Rowe also comments on Dr. Cooperman's contribution to the Fairfield community and his involvement with the church (Exhibit S hereto):

Through a variety of youth-oriented activities, Steve has given generously of his time and talents and support.

I hope that careful consideration will be given to allowing Steve to serve his sentence through vital and effective community service. He is a man of great ability and would offer substantial service in the community, charitable, public service outlets. Indeed,

47

**108.**

Exhibit D

> in our community he is already known for his
> involvement with, and commitment to helping
> others.  Through our church and our church's
> outreach to Bridgeport, through scouting and
> sports, through Jonathan's school, Steve has
> made valuable contributions.

Operation Hope of Fairfield, a homeless shelter for men and women, is another organization in which Dr. Cooperman donated his time and services.  Working to eliminate hunger and homelessness, Operation Hope offers assistance to the poor by providing housing, food and basic needs.  Since the beginning of the year, Dr. Cooperman has been writing articles for the Operation Hope newsletter, speaking in classrooms to raise awareness of the plight of the homeless, and organizing food drives and cookie bakes.  He also organized a school candy drive for Valentine's Day 2001, in which the students collected more than 50 boxes of candy for the residents of the shelter.

For the past two years, Dr. Cooperman has also been a supporter of Habitat for Humanity, an organization that builds houses for the poor.  The organization's goals are to help integrate families into the community by becoming independent, responsible homeowners.  As a volunteer member of the Partnering Committee, Dr. Cooperman has helped low-income families learn more responsible ways to handle their financial obligations.  He has helped to provide more constructive ways to budget money, pay bills and learn life skills.

48

Exhibit D

Dr. Cooperman's charitable nature extended to patients, charitable organizations, friends and family. Cynthia Deluca, who was briefly married to Dr. Cooperman from 1977-1979, writes(Exhibit T hereto):

> .... He was generous with everyone he met, sometimes to a fault. He was always ready to help out whenever someone needed a helping hand, whether it was financial, his time, or with his wisdom and experience. I can cite several examples of his generosity: here are but a few: 1.) On a very personal level, when we separated and divorced, Steve supported me for two years, paid all of my college expenses, furnished my apartment and even bought me a new car. Because of his generosity, I was able to complete my education at UCLA without difficulty. Considering that our marriage was of a short duration and we had no children, I thought his continued financial assistance to be very generous. 2.) Another example of his kindness was while I was in college, I had a very close friend who needed urgent medical assistance. She didn't have any health insurance, but that didn't matter. Steve took it upon himself to get her help. He arranged the necessary medical care and hospitalization, and even guaranteed personally full payment to the hospital and doctor. 3.) The next example was when many years after we were divorced, my parents needed some temporary financial assistance. I asked if Steve could help them out. Of course he did, without any hesitation. When my parents were able to pay him back, he refused to accept the money. He told them to keep it and to buy something for their new grandchild! 4.) And yet another time, my niece had an accident involving her eye, again this was several years after we had divorced. I took her to Steve's office and he immediately took time from his busy schedule to examine her, arrange for the proper care and treatment, and again refused to accept any kind of payment. These are the acts of a

49

110.

kind, caring person. This is the Steve Cooperman who I know.

After the mutual decision was made to divorce in 1979, we kept in touch for many years, until about 1990 when I left the Los Angeles area. Even years after we divorced, Steve was always there for me -- with financial help, simply as a good friend and advisor. Steve constantly encouraged me in my career decisions, always urging me to be creative and to strive to use all of my capabilities and talents.

As far as his patients were concerned, Steve never based his decision on whether or not to help a patient, on their ability or inability to pay. Steve's first priority was to treat his patients, regardless of whether they could afford to pay. From what I could tell when I was in his office, his patients absolutely adored him. Many of them were senior citizens and he would spend a lot of time just listening and talking to them. He was kind and compassionate.

Dr. Cooperman's brother-in-law, Richard P. Graef, Jr., Captain, USNR, writes (Exhibit U hereto):

I am currently a Captain in the United States Naval Reserve and have been on active duty for over 23 years. I have served in a variety of assignments including seven years in the submarine force, three years instructing junior officers at the Navy Supply Corps School and two years supporting NATO forces in Iceland. I am currently the Comptroller at the Naval Shipyard, Portsmouth, New Hampshire.

I met Steve in 1984, just prior to his marriage to my sister Nancy. ... He has been a genuine supporter of my career but more importantly he has been a wonderful addition to our family going well above and beyond the call of duty as a son-in-law and brother-in-law.

50

111.

Exhibit D

\* \* \* \* \*

Steve provided emotional support and financial guidance to my mother after my Dad passed away in 1984. I am an only son, but due to my military requirements have not always been available when needed at home. Steve filled in for me when my mother needed him the most. She has commented on this several times and is forever grateful. Steve painstakingly assisted her in setting up a budget, organizing her finances, and counseling her through this very trying time. No matter how busy, he always found the time to help. He has continued to provide this type of support to the present day.

Dr. Cooperman's first wife, Joellyn, has also expressed her knowledge of Dr. Cooperman's charitable nature (Exhibit D hereto):

You might believe that it's difficult for two people who have experienced the bitterness of divorce to remain on good terms. However, we have continued to be supportive parents to our children and, and because he is a good, caring person, we have remained friends through the years. I am pleased and proud that he is the father of our children.

If I were to choose two qualities that make Steven an outstanding person, they would be generosity and family values. He has always been generous with members of his family. Over the years, while we were married and later on, his sister and her family were having financial difficulties. Steve never hesitated to help them out. In addition, he financed university education for their two bright children. He never asked to be repaid.

When my sister-in-law was diagnosed with Hodgkin's disease at the age of 28, Steven used his medical connections, his time and his persistence to find out where to send her for the best treatment in the country. Marilyn is alive and well today because of Steve's generosity. In this instance, generosity had

51

Exhibit D

nothing to do with money-but everything to do with caring, focusing on a problem and finding the best solution.

I was there through Steve's internship, residency and the building of his medical practice. ... He often volunteered his time in free clinics and performed many surgeries without charging those who could not pay. His patients loved him because his techniques were outstanding, his results were excellent, and he was a caring and compassionate person.

In 1974, there was a patient from Northern California who needed surgery, but didn't have the money to pay. As usual, Steve planned to do the procedure without charging the patient. On a post operative visit, the patient brought a box of opals and insisted on giving them to Steve because he was so grateful to have his eyesight restored. Steve donated all the stones to KCET for their pledge auction. He also donated his time to work on the auction, collecting donations from others and manning the phones at the drive, late into the night.

Dr. Cooperman's sister, Vivian Krasenbaum, has witnessed Dr. Cooperman's charity to the poor and has on occasion been a recipient of his largesse personally (Exhibit V hereto):

He also did charity medical work in East Los Angeles, helping the poor. On one of my visits to my brother in California, while still had his surgical and medical practice, he had planned to spend a morning at a free clinic in East Los Angeles. He invited me to come along with him. I jumped at the opportunity, not only so that I could spend the time with him but also so I could experience what he did in his professional life. What I saw was a compassionate man dealing with people who were, obviously, poor, who were, obviously, from minority backgrounds, and who were, obviously, in great need of medical assistance. My brother was warm, compassionate, and was very much

52

**113.**

Exhibit D

appreciated by these people. Some of the patients had seen him previously and were, obviously, so thankful for his kindness and his good medical care. My brother worked through the lunch hour and we did not leave the clinic until late afternoon, which meant that the half day turned into a full day. He did not get one penny in compensation for his work but, nevertheless, told me that this was the most rewarding part of his practice – taking care of people who needed care and who, otherwise, would have none.

Talking with people in his office the next day, I learned that this was a regular activity for my brother. I will never forget that day with my brother at the free clinic. He devoted, literally, hours and days of his time on a regular basis at this clinic and two other clinics, providing free service for poor people.

In 1971, when my mother was dying of cancer, we were sitting in a restaurant near the hospital and Steven said to me, "I, as a physician, will be a bigger income producer than you and you can always depend on me to assist you whenever you have financial worries".

And he was true to his word. He frequently phoned to be sure things were ok. He was always there for me to turn to for advice. I remember one instance to demonstrate Steve's humanitarianism. When my dog scratched my husband's eye and my husband was in need of medical attention, I informed me and he consulted with a UCLA ophthalmologist, found out who was outstanding in Birmingham, and directed us to that doctor for treatment.

Steven helped me and my children in the mid and late 1980's and in 1990. My husband was "pushed out" of a position as Associate Professor in 1981 and could get only sporadic employment. Even with my two jobs, it was very difficult to make ends meet. Steven helped me and my two children with money and

53

Exhibit D

> good deeds, never expecting anything in
> return. As an example, he paid thousands of
> dollars to an orthodontist for braces for my
> daughter. (We could not have afforded this.)
> He also helped me with substantial credit card
> debt which I had not been able to avoid. He
> never expected repayment.

Vivian's husband, Burt, has also written concerning Dr.

Cooperman (Exhibit W hereto):

> On a more personal note, Steven directly
> assisted me on numerous occasions, vìs a vìs,
> ophthalmological consultations, monetary help,
> during a devastating period of my life, and
> numerous times when I needed brotherly advice
> concerning decision-making involving life's
> vicissitudes.
>
> However, the most profound aspect of Steven's
> generous nature, is his compassion for the
> less fortunate. Only yesterday, he told me,
> in an offhanded way, that he was working with
> a homeless shelter, in his community. We
> discussed his various activities he engages
> in. He also expressed to me his excitement
> over his son, Jonathan's involvement in the
> shelter's operation. This does not startle or
> surprise me in the least. In fact, it appears
> to be quite logical and consistent with the
> raison d'etre of Steven's life.

Joellyn Peruchini's sister-in-law also benefitted from Dr.

Cooperman's compassionate nature (Exhibit X hereto):

> In November of 1972, I was diagnosed with
> Hodgkin's Disease. I was in shock and didn't
> know how to handle the situation. Every
> doctor that I consulted had a different
> opinion as to where and how I should be
> treated. Steve came to my aid immediately.
> He did extensive research and helped me
> determine that Stanford University afforded me
> the best chance for a cure. I am convinced
> that Steve saved my life. Not only did he
> help me ferret through the many medical

54

Exhibit D

decisions that had to be made, but also he was there for me emotionally. He was always ready to listed as I expressed over and over my fears and concerns. The whole ordeal was made much easier because of him.

My family also experienced the professional side of Steve as a skilled and talented ophtalmic surgeon. My mother was losing her eyesight in the early 1980's. I suggested that she go to Steve for her care. He performed cataract and lens implant surgery with great skill and treated her with kindness and compassion. She is 91 years old, and to this day credits Steve with her enjoyment of life.

\* \* \* \* \*

After Steve and Joellyn separated in 1975 (Joellyn is my husband Tom's sister). Tom and I continued our relationship with Steve. We continued to travel and take vacations with him, he was always invited to our family dinners and celebrations, we often spent evenings at Steve's home, and simply, our close relationship has continued. When he married Nancy in 1983, that did not change. Our friendship continues, simply because of the kind of person Steve is. We did not and do not want to be without his friendship. I am honored to be his friend and notwithstanding his current legal situation will always stand behind him.

It may seem remarkable that not only does Dr. Cooperman enjoy the love and support of two women from whom he is divorced, but he is also loved by members of their families. You just don't stay close friends with in-laws of ex-wives unless there is something special about you. Dr. Cooperman has that special quality. This quality is expressed in a nutshell in the letter from his friend, Jeffrey Tarte (Exhibit Y hereto):

55

Exhibit D

Steven is the most loyal, giving friend that a
man could want.  During a recent hospital stay
for a major surgical procedure, Steven was on
the phone with me several times daily making
sure that my spirits never flagged.  You only
expect that kind of attention from a family
member, but Steven was always there.  You
never forget friends like that, and frankly, I
can not afford to lose that kind of loyalty
and affection, not at this stage of my life.

\* \* \* \* \*

Steven's heart is as open to charity as it is
to his family and friends.  He contributed a
dramatic amount of money when Jonathan became
involved in Jerry Lewis' Muscular Dystrophy
efforts.  Jerry Lewis was so touched by their
efforts that the Cooperman Family was invited
to be his guests at the telethon held in Los
Angeles.

The Coopermans regularly prepare and deliver
food to the Operation Hope Shelter.  Steven
actively contributes his time and knowledge in
the Habitat for Humanity.  He counsels
families in how to manage and succeed in their
new home environment.  Please, your Honor
Judge Rafeedie, this is a voice and an effort
not to be stilled.

The foregoing graphically demonstrates the extraordinary civic

and charitable contributions Dr. Cooperman has made to a wide

variety of people from the poor, elderly and infirm to major

universities, hospitals and to the children and small charities of

his community.  Clearly, such extraordinary charitable work

constitutes grounds for a departure under Guidelines § 5H1.11.

As numerous courts have held, "extraordinary" charitable and

civic contributions constitute an accepted ground for a departure.

See, for example, United States v. Takai, 930 F.2d 1427 (9th Cir.

56

117.

Exhibit D

1991); <u>United States v. Serafini</u>, 233 F.3d 758 (3d Cir. 2000); <u>United States v. Tocco</u>, 200 F.3d 401 (6th Cir. 2000); <u>United States v. Woods</u>, 159 F.3d 1132 (8th Cir. 1998); <u>United States v. Rioux</u>, 97 F.3d 648 (2d Cir. 1996). This is especially so where the charitable work entails not just financial support, but expenditures of time and energy. <u>United States v. Serafini</u>, <u>supra</u>; <u>United States v. Tocco</u>, <u>supra</u>. Even relatively minor acts of kindness, in comparison to the substantial and repeated charitable works of Dr. Cooperman, can justify a downward departure. For example, in <u>United States v. Woods</u>, <u>supra</u>, the 8th Circuit affirmed a downward departure where the defendant brought two troubled young women into her home and paid for them to attend a private high school and helped an elderly friend move into a nearby apartment, thereby enhancing her friend's remaining years. These acts of kindness by the defendant in <u>Woods</u>, while clearly laudable, pale in comparison to the steady stream of charitable works engaged in by Dr. Cooperman throughout his lifetime.

Here, not only did Dr. Cooperman donate large amounts of money to charitable causes, he devoted even larger and more significant amounts of his time and skill. Literally hundreds of people can see because of Dr. Cooperman's charity. Notwithstanding the intense time pressure he was under in a busy practice and as the father of two young girls, he always found the time to perform surgeries on people who could not pay for them. And he did it all

57

Exhibit D

with a smile.  He made the people he helped not only physically better but emotionally better, because they knew he cared about them.  Surely, a lifetime of good works deserves substantial consideration.

### Dr. Cooperman's Suffering and Remorse:

The events of the past two years have been devastating to Dr. Cooperman.  Fully aware of his own responsibility for his current situation, he is full of remorse and regret, especially for the inevitable damage he has caused and will cause to his son Jonathan. He has not only ruined his otherwise fine reputation and humiliated himself and his family in front of his friends and relatives, but he has risked his son's emotional well-being in the process.   No one is more aware of his own guilt than Dr. Cooperman.  He writes (Exhibit Z hereto):

> It is nine years, almost to the day, since my two paintings were removed from my home in Los Angeles.  Ever since the morning after the paintings were taken, I have had a very difficult time accepting the reality that I was involved in this crime.  Although I did not let anyone know what I had done, and even tried to convince myself that I was not to blame, I knew I was and I felt guilty and ashamed of what I had done.

> \* \* \* \* \*

> ... I will not try to justify my actions, because there is no justification for what I did.  It was wrong, stupid, thoughtless, and selfish.

> \* \* \* \* \*

58

**119.**

Exhibit D

Since July, 1992, when the "theft" occurred, I have lived under a dark cloud.  I have a wonderful wife, 3 wonderful children and 3 adorable grandchildren.  I have many wonderful friends.  There have been birthdays, weddings, many reasons to celebrate.  But for me, every celebration was and continues to be infected with shame and humiliation.

\* \* \* \* \*

I have done irreparable damage and harm to those I love most dearly.  I have lost the most important thing that one can have with loved ones - trust.  My wife can not possibly trust me like she had in the past.  My children must look at their father as foolish and defective.  They cannot possibly respect me, or look up to me like they had in the past, even though I know they still love me.

\* \* \* \* \*

My young son, Jonathan, is eleven years old. We have a very close relationship.  I love Jonathan, and he loves his dad - unconditionally.  He is aware of my misdeed. That is, perhaps, the most painful part of this whole mess - that my son has to carry this burden.  He is young, and, I fear, still does not understand and has not felt the full impact of what I have done.  I lie awake at night hating myself for this.  I can never undo this terrible damage to him.  I will be forever tainted in his eyes.  I am ashamed of what I have done to myself and my wife and my children.

\* \* \* \* \*

These are horrible times for me.  I apologize to you, to everyone I have disappointed and hurt.  I hope it is possible for my family and community to forgive me.

Exhibit D

He has expressed these feelings to his friends and family, all of whom are fully aware of his criminal conduct.  As Mr. Camarda writes (Exhibit P hereto):

> I am very aware that Steve was convicted of insurance fraud.  We have discussed his situation on numerous occasions, and I can tell the Court with certainty that Steve suffers greatly for what he has done.  He has been personally humiliated and his life has been affected immensely.  He is very remorseful for his misdeed, and is very concerned about the damage it has caused to his wife and children.  Our family knows the Coopermans well - we know Jonathan, and hope and pray that this extremely nice, bright and sensitive boy be spared any more pain and damage.

Cliff Paige, Jonathan's math teacher at Fairfield Country Day School, has also written to the Court concerning the impact this situation has had on Dr. Cooperman.  He writes (Exhibit AA hereto):

> ... [when] I first read of Steve's legal difficulties, I was very upset at what I read, and I did not hesitate to call him almost immediately.  He explained a lot of things to me, and we talked for a long time -- about the present, the future, our dreams, our hopes and our families.  I was worried about him, but as we spoke I realized that he was also worried about me.  I think that this one moment illustreated to me what I think about Steven Cooperman.  He is a man of emotions, values and tradition.  In this one conversation, I saw his passion, his sense of commitment, and his generosity.  For the past year, I have never hesitated to contact Steve, whether I wanted to see how he was doing and see if I could help, or whether I just wanted to talk and maybe share some of my concerns about my life with him.  And whenever I spoke with him, after we finished, I always felt better.

Exhibit D

> The past year has been a difficult one for
> Steve. Although I can still detect a bounce
> in his step when he is walking through school
> to pick up Jonathan, there are times when his
> pace is slowed by the weight that he is
> carrying. I hope and pray that this weight
> can be lifted.

As Jodi Martin writes (Exhibit M hereto):

> ... I know that Dr. Cooperman's legal problems
> have been a great strain for him and his
> family. When I talk to Dr. Cooperman, it is
> easy to tell how deeply depressed he is and
> how very worried he is about his family. Dr.
> Cooperman's life revolves around his family
> and he is devastated at the impact that these
> events have had on his family.

The letter of Joshua Levine, who knows Dr. Cooperman in a business setting, demonstrates how Dr. Cooperman's friends and business associates have "refused to let Steve out of their lives" even though his conviction and its impact on his emotional well-being are well known to all. He writes (Exhibit BB hereto):

> I have known Steve for approximately four
> years. We met when he was on the Board of
> Directors of Medjet, Inc., a company also from
> Edison, NJ, which is developing eye surgical
> instrumentation. In the four years since we
> met, I have had occasion to speak with Steve
> regularly and I have seen his devotion to his
> family, his commitment to his wife and
> children and his active involvement with his
> community. I have met numerous people (on
> related and unrelated business) that have only
> had nice things to say about Steve. I have
> witnessed firsthand his integrity in dealing
> with people even under adverse conditions. In
> the four years of my knowing him, I have never
> witnessed any occasion in which Steve acted
> inappropriately or that he did not act with
> integrity and honor.

122.

Exhibit D

> Unfortunately, I have also seen Steve's life literally fall apart with his conviction. He was literally paralyzed into inaction with his legal troubles. I have seen how friends and business acquaintances of Steve have continued to seek his advice and guidance in spite of his legal troubles and how they have refused to let Steve out of their lives.

The letter of Ruth Salce also testifies to the impact Dr. Cooperman's conduct has had on his life. She writes (Exhibit G hereto):

> I am fully aware of Steve's legal situation. We have discussed it often and at length, and I can tell you that Steve is devastated by his actions. He is very remorseful and sincerely regrets the mistake he made.

The torment being suffered on a daily basis by Dr. Cooperman is graphically illustrated in the letter of his close friend and brother-in-law, Vincent McLaughlin. He writes (Exhibit F hereto):

> This is a grave personal crisis for Steve, and I have tried to help him through it and give him my best advice and support. He has been decimated by the overwhelming weight of his mistake in judgment and by the consequence of his actions. He has told me that he "hates himself". The ramifications of his crime have already caused and will continue to cause a great deal of damage to his marriage and family, and especially to his son. Steve has suffered tremendous self-loathing and has told me often how he regrets so much the mistake he has made. He clearly and fully realizes the error in judgment that he made. Knowing Steve as well as I do, I can only conclude that he had a terrible lapse in judgment because of financial and other pressures. His action is 1992 is not typical of the character and behavior of this man whom I have known so well for the past 17 years.

123.

Exhibit D

Clearly, Steve knows he made a grievous error
- he knows that he cannot turn back the clock
to right his wrong.  I know that he has always
given so much to others in so many ways.  To
this day, he continues to give to others.  His
ongoing actions make it clear that he
certainly has not in any way continued to make
similar mistakes.

*  *  *  *  *

... Tragically, he made a grievous mistake in
judgment that has almost destroyed him in so
many sad and tragic ways.  I know that Steve
fully realizes his error - he suffers with
that realization every moment.  If Steve could
be shown leniency, I know he will continue to
use his skills, attributes and talents to help
serve the community.  At the same time,
leniency will minimize the damage to his son
and his family.  By this, it would achieve the
objectives of punishment, yet still allow
others to benefit from what he has to offer
when he uses his unique talents as he has done
in such a benevolent way.  I feel this from my
heart, and plead for a reduction in his
sentence, and hope I have been able to express
to you clearly my feelings and beliefs.

Dr. Cooperman has fully and completely accepted
responsibility for his actions.  He has expressed his guilt and
remorse to the Government, to the Court, and to his friends and
family.  During the course of his cooperation, he fully disclosed
all of the facts and details of his crime and accepted
responsibility for incriminating facts which had never been
disclosed previously to the Government.  He has agreed to withdraw
all motions, has waived his appeal, and has agreed to pay all taxes
due and owing and to use his best efforts to make restitution.  Dr.

63

Exhibit D

Cooperman's sincere and substantial acceptance of responsibility justifies a two level decrease in his Guidelines pursuant to § 3E1.1.

While normally an acceptance of responsibility reduction follows a guilty plea, a plea of guilty is not required.  As the Ninth Circuit Court of Appeals held in <u>United States v. McKinney</u>, 15 F.3d 849 (9th Cir. 1994) at 852:

> ... Nothing in the guidelines requires a defendant to plead guilty in order to receive the reduction. <u>See</u>, <u>United States v. Gonzales</u>, 897 F.2d 1018, 1020 (9th Cir. 1990).  Indeed, were a defendant **required** to plead guilty to be entitled to the reduction, the sentencing guidelines would penalize the exercise of the constitutional right to go to trial.  <u>See</u>, <u>United States v. Johnson</u>, 956 F.2d 894, 904 (9th Cir. 1992).  Where a defendant manifests a genuine acceptance of responsibility for his actions, he is entitled to the reduction even if he does not plead guilty.  <u>See</u>, U.S.S.G. §3E1.1 cmt. 2 ("conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction").  (Emphasis in original)

This is so even where the defendant contests factual guilt at the trial and puts the Government to its proof.  As the <u>Mc Kinney</u> court held:

> The government argues, and the district court appeared to assume, that a defendant who goes to trial can only receive the reduction if the trial is limited to issues unrelated to factual guilt.  This argument relies on a passage from the application notes, which states that:
>
> > "In rare situations, a defendant may clearly demonstrate an acceptance of

64

125.

Exhibit D

> responsibility for his criminal
> conduct even though he exercises his
> constitutional right to a trial.
> This may occur, for example, where a
> defendant goes to trial to assert
> and preserve issues that do not
> relate to factual guilt (e.g., to
> make a constitutional challenge to a
> statute or a challenge to the
> applicability of a statute to his
> conduct)."

U.S.S.G. § 3E1.1 cmt. 2 (1991). Although the
application notes list only the single example
of a case where a defendant can receive the
reduction despite going to trial, the quoted
passage itself makes clear that the example
was not intended to be exhaustive. We hold
that, in appropriate circumstances the
reduction is also available in cases in which
the defendant manifests genuine contrition for
his acts but nonetheless contests his factual
guilt at trial.

**Our focus on the defendant's personal
contrition, rather than his exercise of his
constitutional rights, best serves the
purposes of acceptance of responsibility
reduction. The primary goal of the reduction
is to reward defendants who are genuinely
contrite.** (Citations omitted) In the ordinary
case, a defendant who pleads not guilty and is
convicted will have a difficult time
convincing the court that a subsequent
acceptance of responsibility for his actions
is anything but a self-serving and insincere
expression. Where a defendant's statement and
conduct make it clear that his contrition is
sincere, however, he is entitled to the
reduction even if he is convicted after a
trial. Ibid. at p.853.

Indeed, the Ninth Circuit has upheld a two level

reduction for acceptance of responsibility even where the defendant

proceeded to trial, contested factual guilt, and only "accepted

65

126.

Exhibit D

responsibility" as he stood before the court at the time of his sentencing.  The Circuit affirmed the downward adjustment citing the great deference on appeal which must be given to the sentencing judge's "unique position to evaluate the defendant's acceptance of responsibility" and rejecting the Government's argument that the downward adjustment was unjustified because of the "eleventh hour nature of Hill's acceptance of responsibility".  United States v. Hill, 953 F.2d 452, 461 (9th Cir. 1991), cited with approval in McKinney, supra, at 854.

Here, Dr. Cooperman has demonstrated far more sincere regret and remorse than the defendant in Hill.  Dr. Cooperman's acceptance of responsibility and expression of remorse is not made solely on the eve of sentencing.  It was expressed long before sentencing and has been expressed repeatedly to friends, family and the Government.   He has explained in detail the crime that he committed, how it occurred, and has been willing to admit incriminating facts previously unknown to the Government.  Thus, the record more than justifies a two level downward adjustment for acceptance of responsibility.

127.

Exhibit D

## Conclusion

We respectfully request that the Court downwardly depart both for substantial assistance, 5K1.1, and for extraordinary charitable and civic contributions, 5H1.11, and grant a downward adjustment of two levels for acceptance of responsibility, 3E1.1.  We further respectfully request that the Court then impose the minimum guideline sentence applicable after all departures and adjustments.


Dated:   June 27, 2001

                              Respectfully submitted,

                              LITMAN, ASCHE & GIOIELLA, LLP

                              By: _____
                                  Russell M. Gioiella (5898)

                              45 Broadway
                              New York, New York 10006


                              TALCOTT, LIGHTFOOT, VANDEVELDE,
                              SADOWSKY, MEDVENE & LEVINE

                              633 South Hope Street
                              Los Angeles, California 90017

                              Attorneys for Defendant
                              Steven G. Cooperman, M.D.

128.

Exhibit D

May 15, 2001

Honorable Edward Rafeedie
United States District Court
312 North Spring Street
Los Angeles, California  90012

Dear Honorable Edward Rafeedie,

I am writing to you on behalf of my father, Dr. Steven Cooperman.  I am thirty one years old and live in Colorado.  I am the mother of two young children and take care of them as my full time job.  I have a background and education in the Counseling field, and have also had experience as a teacher.

My father is a very intelligent man, and always uses his skills, abilities, and compassion in his everyday life.  I believe that my father values his family as the most important aspect of his life.  I see this by looking at the past as well as the present.  Growing up in a divorced family, my sister Kelly and I spent a great deal of time living with my dad full time.  My dad was so thrilled that we were living with him, and he changed his entire life and schedule around to accommodate the situation.  He was always happy to do things like this for us.  He was as involved in my life and activities as much or more than any two parent families I knew.  When I was in elementary school, my dad acted as the "class mother" for many years.  He came to my classes every week for show and tell (often bringing in the family pets).  Dad always volunteered to drive on our class field trips.  My dad was a leader in my, as well as my sister's, Indian Princess group.  By the time I was ten years old, my father was my little league coach.  This always meant a great deal to me, and he loved to do it.  Throughout my childhood years, my father took my sister Kelly and I on countless traveling expeditions.  He was always encouraging us to learn about where we were by taking us to museums, sightseeing, etc.

My dad always wanted us to be well-rounded people.  He encouraged us to excel in education, as well as other activities (piano, tennis, sports, and art).  While growing up at our house my dad organized lots of events for my classmates and I.  He started a review class for exams, and invited my whole class to attend.  We always had a lot going on at our house.  All of my friend's parents were always glad to send their kids over to my house.  I now have a Master's Degree in Counseling.  My sister is studying for a Master's Degree in Psychology.  We directly have our father to thank for our academic and professional accomplishments.

My relationship with my father has not changed much.  We remain close today.  He is a huge influence in my life now, and is always here for support and guidance.  I see now too, what a wonderful relationship he has with my brother Jonathan, who is eleven years old.  He spends every waking moment being a

Exhibit D to Memorandum
Exhibit A to Exhibit D

Exhibit D

father to Jonathan. He is there when he wakes up for breakfast, in the cheering section of every activity Jonathan participates in, helps him with his nightly homework, and reads to him before bed each night. My dad was also a Cub Scout Leader for Jonathan's troops for years. I think Jonathan is a very lucky boy to have a father so willing and excited to share in his life!

My father has had some health problems in the past, that have also had a huge influence on the course of his professional life. When I was fourteen years old my dad had a heart attack. It was terrifying to my family and me. Since then, he had to discontinue practicing medicine, which he used to enjoy immensely, and be very gifted at. I know how great his medical work was, and saw it first hand while working at his office and meeting his patients. His patients were all very happy and appreciative of the care he took of them. He successfully restored so many people's eyesight. My father would always make sure his patients could get to and from surgery and appointments if they had no transportation. He truly cared about their welfare, and they all loved him for that.

My father's legal problems have been devastating to our entire family. It has taken a toll on everyone, and has been stressful on us all. I really believe that my father would be an exceptional candidate for community service. He has shown the dedication and commitment in his personal life (as I have shown), as well as in other community and volunteer work he has been doing as far back as I can remember. He is currently involved in the Jerry Lewis Muscular Dystrophy Foundation, Habitat for Humanity, as well as Operation Hope (a local organization providing food for the homeless). He is always willing to contribute his time, energy, expertise, and finances to a worthy cause. If given the opportunity, I know my dad will dedicate himself completely to any community service project he is given the chance to work on.

My father is extremely remorseful about the mistakes he has made in the past. He expresses this constantly, and wishes there were a way to turn back the clocks and change his actions. If there is any way he could right his wrongs he would. Please consider some of the facts I have mentioned when sentencing my father. It would be devastating for me, my sister Kelly, and especially my brother Jonathan (as well as everyone who knows my dad), for him to be taken away from his family. Your Honor, I really appreciate you taking the time to read my letter. I hope to have helped show you that my father is really a good person, who has made a drastic mistake. Again, you have my deepest gratitude for your consideration.

Sincerely,

Jacki Isles

Exhibit D